IN THE MATTER OF PETER J. CORUZZI, JUDGE OF THE SUPERIOR COURT OF NEW JERSEY.

Argued January 24, 1984—Decided March 20, 1984.

558

*Eugene J. Sullivan,* Assistant Attorney General, argued the cause for State of New Jersey (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Eugene J. Sullivan* and *James J. Ciancia,* Assistant Attorneys General, of counsel; *Peter R.*

*Freed* and *Jonathan L. Williams,* Deputy Attorneys General, on the briefs).

*Roger A. Lowenstein* argued the removal cause for respondent *(Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor,* attorneys; *Robert D. Chesler,* on the brief).

*Robert A. Gleaner* argued the compensation cause for respondent *(Lario and Nardi,* attorneys).

The opinion of the Court was delivered by

WILENTZ, C.J.

Society invests its leaders with many powers. No power is greater, nor its responsibilities more awesome, than that given a judge. The power to render final judgment is limited only by the law and the judge's conscience. Society gives this power on condition that judges be independent, trusting them and no one else. Respondent sold this power, he sold his judgments, he sold his independence. He not only betrayed his trust, he betrayed New Jersey's tradition of judicial honesty: in the more than 35 years since the creation of our new court system, consisting now of more than 300 judges, only one other judge has been indicted.

This opinion disposes of two matters: the complaint instituted by this Court for removal of Judge Coruzzi, and his challenge to the statutory amendment that enabled us to withhold his pay indefinitely during the removal proceedings, the statute having previously limited that power to 90 days. We hold the statutory amendment valid. We further hold that Judge Coruzzi must be removed from office.

Judge Coruzzi was arrested on November 6, 1981, immediately after having accepted a bribe.[1] He received the bribe from a lawyer while the two were driving in the lawyer's car to the courthouse. The lawyer had previously confessed to the bribery conspiracy and had been granted immunity from prosecution

---

[1] Our conclusory statements of Judge Coruzzi's guilt are based on his March 25, 1982, bribery conviction.

based on his agreement to cooperate. He was "wired" to enable law enforcement personnel to hear the entire conversation between the two as it took place. When Judge Coruzzi got out of the car at the courthouse he was arrested. He had the bribe money ($12,000) in his jacket.[2]

At the request of the Chief Justice, the Assignment Judge immediately relieved him of all duties. On the next day this Court filed a complaint for his removal and suspended him without pay. *N.J.S.A.* 2A:1B–3, –5. Pursuant to the removal statute, *N.J.S.A.* 2A:1B–10, we withheld further proceedings pending the outcome of the criminal action.[3]

On March 25, 1982, Judge Coruzzi was convicted of four counts of bribery in violation of *N.J.S.A.* 2C:27–2.[4] The jury's verdict amounted to a finding that in three separate criminal matters Judge Coruzzi had accepted or agreed to accept bribes; that he agreed in two of them not to impose a custodial sentence and, in the third, to change a custodial sentence to non-custodial.

---

[2]For details of this and the other bribery incidents, *see infra* at 566–567 n. 5.

[3]*N.J.S.A.* 2A:1B–3 provides:

A proceeding for removal may be instituted by either house of the Legislature acting by a majority of all its members, or the Governor by the filing of a complaint with the clerk of the supreme court, or such proceeding may be instituted by the Supreme Court on its own motion. *N.J.S.A.* 2A:1B–5 provides:

The Supreme Court may suspend a judge from office, with or without pay, pending the determination of the proceeding.
*N.J.S.A.* 2A:1B–10 provides:

No hearing to remove a judge from office as provided for in this act shall be held until the cause for suspension, if the cause is a result of an independent civil, criminal or administrative action against the judge, is finally decided in a tribunal in which the judge had an opportunity to prepare his defense and was entitled to be represented by counsel.

[4]The convictions included instances of bribery in addition to that which led to his arrest. He was also convicted of official misconduct, in violation of *N.J.S.A.* 2C:30–2, and of conspiracy to commit official misconduct and bribery, in violation of *N.J.S.A.* 2C:30–2 and *N.J.S.A.* 2C:27–2. The trial court dismissed these, sentencing respondent on the four bribery counts only.

In two of the cases, he received the money; in the third he solicited the bribe but never received it. The evidence against him was overwhelming. On May 7, 1982, he was given a five-year prison sentence. On appeal the Appellate Division affirmed, *State v. Coruzzi,* 189 *N.J.Super.* 273 (1983), and we denied certification. 94 *N.J.* 531 (1983).

The criminal matter having been concluded, the removal proceedings commenced. A three-judge panel was designated for the purpose of taking evidence in the matter pursuant to *N.J.S.A.* 2A:1B–7. The Attorney General prosecuted the removal proceedings in accordance with *N.J.S.A.* 2A:1B–4 (and defended the challenge to the constitutionality of the statutory amendment noted above and addressed in detail below). Respondent declined the panel's offer to supply him with counsel and waived his right to appear at the hearing. The evidence before the panel consisted mainly of the indictment, the judgment of conviction, and documents evidencing respondent's voluntary waiver of counsel and right to attend the hearing. The panel found that the conviction conclusively established Judge Coruzzi's guilt and, given the facts alleged and the crime charged, mandated his removal from office.

At respondent's request, we then appointed counsel on his behalf. The matter (along with the dispute concerning his pay) has now been thoroughly briefed and argued by Judge Coruzzi's counsel and by the Attorney General.

During the course of the criminal proceedings, Judge Coruzzi brought a civil action in the United States District Court for the District of New Jersey seeking a declaration that *L.*1981, *c.* 522, the statutory amendment authorizing the indefinite withholding of pay during removal proceedings, was unconstitutional. The District Court ruled the statute constitutional and granted the State's motion for summary judgment. *Coruzzi v. New Jersey,* No. 82–535 (May 13, 1982). On appeal, the Court of Appeals for the Third Circuit affirmed, but on different grounds. It held that abstention by the federal courts was appropriate since the

questions presented implicated important state issues and were the subject of an ongoing state judicial proceeding. *Coruzzi v. New Jersey*, 705 *F.*2d 688, 690–91 (3d Cir.1983). It assumed correctly that Judge Coruzzi could obtain a prompt adjudication of the federal constitutional issues through a motion made directly to this Court to modify our prior order indefinitely withholding his pay. *Id.* at 691. Such a motion has been made and, as noted, was briefed and argued along with the removal issue.

### The Removal Proceedings

■ We hold that a judge who accepts a bribe must be removed from office. There can be no exceptions whatsoever.

One might argue that there might conceivably be some bribery case somewhere with mitigating circumstances sufficient to justify discipline other than removal. That case will have to be argued elsewhere. In New Jersey nothing other than removal will do, no matter what the circumstances.[5]

---

[5]The indictment and the testimony show that the conviction in this case constituted a factual finding that, beyond a reasonable doubt, respondent, in three separate incidents, solicited bribes, and in two of these, received them.

In January 1981, respondent sentenced Eugene Bocelli to a five-year jail term for aggravated assault. In March 1981, respondent informed Louis Caggiano, a member of the bar, that upon reconsideration Bocelli could receive a suspended sentence and be released from jail "for a price." After a series of meetings between Caggiano and Bocelli's brother, the price of $10,000 was agreed upon, $7,000 of which would go to respondent. In May 1981, respondent encouraged Bocelli's attorney to file a motion for reconsideration and persuaded the Assistant Prosecutor not to object to that motion. Respondent then granted the relief sought, releasing Bocelli from prison.

When William Keyser, indicted for the theft of $33,500 found in the trunk of his car, appeared before respondent, respondent asked Caggiano to see what arrangements could be made regarding the matter, cautioning Caggiano to leave respondent's name out of any discussions. In October 1981, Caggiano contacted an attorney no longer representing Keyser and indicated that $35,000 would ensure a non-custodial sentence for Keyser. $25,000 would go to respondent. Respondent then contacted the same

Respondent contends that the removal statute requires the Supreme Court (or the three-judge panel) to hear the underlying evidence that constitutes the cause for removal, that reliance on a criminal conviction is impermissible. He further contends that this Court should disqualify itself because it prejudged his guilt.

 We know of no doctrine defining what effect must be given in these removal proceedings to the judge's bribery conviction. We are not barred by constitutional law from according it full collateral estoppel consequences. All of the conditions of that doctrine are present (the issues were in fact litigated, the burden of proof is the same, the parties, essentially, are identical). The constitutional restraint, in New Jersey, inhibits the use of collateral estoppel only in subsequent *criminal* proceedings. *State v. Ingenito,* 87 *N.J.* 204, 216–17 (1981). The proceedings here are not criminal. *Board of Chosen Freeholders v. Conda,* 164 *N.J.Super.* 386, 391 (Law Div.1971); *accord, e.g., McComb v. Commission on Judicial Performance,* 138 *Cal.Rptr.* 459, 463–65, 564 *P.2d* 1 (Cal.Spec.Trib.1977).

---

attorney by telephone to see if the attorney would attempt to be reassigned to Keyser's case.

In July 1981, respondent presided over a trial resulting in a jury conviction for arson against Sergio Morselli. Again, respondent asked Caggiano to contact Morselli to arrange for a suspended sentence. Respondent mentioned a price of $20,000. In October 1981, Morselli gave the State Police information on respondent's discussions with Caggiano. In exchange for a grant of immunity, Caggiano agreed to cooperate with the police and was fitted with electronic surveillance equipment. Caggiano obtained $5,500 from Morselli, $3,000 of which he gave to respondent on October 23, 1981. On November 6, Caggiano picked up respondent at an automobile dealership and handed him $12,000 during the ride to the courthouse. Law enforcement officers were monitoring the conversation. Respondent, who placed the money inside his jacket breast pocket, was apprehended and arrested by police immediately after leaving Caggiano's car.

A more complete recitation of these incidents can be found in the Appellate Division opinion, 189 *N.J.Super.* 273, 281–91. Caggiano has since been disbarred. 108 *N.J.L.J.* 545 (1981).

■ Nor are we *required* to accord collateral estoppel effect to the bribery conviction and the factual determination upon which it was based. Collateral estoppel is not mandated by constitution ·or statute. Rather it is a doctrine designed to accomplish various goals, a rule not to be applied if there are sufficient countervailing interests. *Plainfield v. Public Service Elec. & Gas Co.,* 82 *N.J.* 245, 258–59 (1980).

Given the unique nature of these proceedings and their unequalled importance, collateral estoppel's application must depend completely on its consistency with the goals of removal proceedings. In New Jersey, where these proceedings are constitutionally based, and where the Constitution imposes responsibility on the Legislature for both their substance and procedure, *N.J. Const.* of 1947, art. VI, § VI, para. 4, legislative intent on that issue is critical.

The removal statute itself is no help in determining what effect the Legislature intended a criminal conviction to have. Respondent, in support of his contention that this Court must again try these issues, notes that the removal statute permits the issuance of subpoenas to witnesses and the production of evidence at the hearing before the Court or the three-judge panel. Obviously those statutory provisions were designed to allow live testimony where appropriate, but not to compel it where inappropriate. Those provisions are nothing more than the necessary tools to assure production of live testimony when and if required. They tell us nothing except that *some* removal proceedings may require such testimony. They do not at all suggest that the many rules of evidence used in ordinary trials to dispense with live testimony (through documents or exceptions to the general hearsay exclusion) are not applicable in these proceedings.

The statute simply does not tell us what effect may be given to the admission in evidence of the judge's conviction. The only section suggestive of a clue—*N.J.S.A.* 2A:1B–10—is, upon analysis, not helpful at all. That section prohibits a hearing on the

removal charge until civil, criminal or administrative proceedings dealing with the same matter have been fully concluded. That prohibition applies only if the proceeding was one in which "the judge had an opportunity to prepare his defense and was entitled to be represented by counsel." *Ibid.* One implication of the quoted material, along with the prohibition against simultaneous removal proceedings, is that the judge, having had the benefit of counsel, should be bound by the results of those proceedings. Further analysis, however, suggests the contrary.

The burden of proof in removal proceedings is beyond a reasonable doubt. *N.J.S.A.* 2A:1B–9. The Legislature could not have intended that a judge, held liable in a civil or administrative proceeding under facts found by a preponderance of the evidence, would be foreclosed from challenging those facts in a removal action where the same facts have to be established beyond a reasonable doubt. The judge may, therefore, contest facts in a removal proceeding that were previously found in a civil or administrative proceeding. The section of the statute here involved (*N.J.S.A.* 2A:1B–10) treats criminal, civil, and administrative proceedings in an identical fashion. We therefore must conclude that the section itself provides no support for the contention that a criminal conviction is conclusive in removal proceedings, since civil or administrative determinations, treated identically in the statute, could not be given conclusive effect.[6]

Nor does the statute's legislative history provide much help. Article VI, § VI, para. 4 of our Constitution delegates to the Legislature the authority to enumerate the causes for which and the manner by which the Supreme Court may remove judges of

---

[6] A somewhat more persuasive contention could be made that the Legislature intended by that section to *foreclose* removal proceedings where the judge *prevailed* in the related criminal, civil, or administrative proceeding. While we have no occasion to pass on that issue, we note that there are substantial countervailing policies, *i.e.,* the public's interest in removing a dishonest judge should not be compromised by related civil or administrative proceedings that may have been informal or, perhaps because of lower stakes, less vigorously prosecuted.

the Superior Court from office. This legislative power lay unexercised from the adoption of the Constitution in 1947 until the enactment of the removal statute in 1970. During the intervening years the procedure for protecting the public from incompetent judges, namely impeachment pursuant to art. VI, § VI, para. 4, was regarded as impractical, and loss of judicial office as a result of disbarment (*see In re Mattera*, 34 *N.J.* 259, 268–69 (1961)) had proven a cumbersome alternative. The disciplinary sanctions available to this Court were widely recognized to be insufficient to the task of maintaining public confidence in the judiciary.

The legislative response pursuant to the constitutional power was provoked in part by the call to provide this Court with a direct vehicle for removing from the bench judges who had engaged in criminal conduct. See "Legislation needed for Judicial Discipline and Removal," 92 *N.J.L.J.* 336 (1969) (editorial); "Removal of Judges Senate No. 166," 93 *N.J.L.J.* 52 (1970) (editorial). The procedural particulars, beyond the fundamental parameters such as burden of proof, composition of the tribunal, and respondent's right to have counsel and to offer evidence, left much to the Supreme Court's discretion, both by implication—by failing to define proceedings in more detailed and restrictive terms—and explicitly—by providing that, "[e]xcept as otherwise provided in this act, proceedings shall be governed by rules of the Supreme Court." *N.J.S.A.* 2A:1B–8.

Removal proceedings are unique. The interests involved are so great that the Legislature required that the matter be heard directly by the Supreme Court or through its designated three-judge panel. No other proceeding is given this primacy. That the interests served by collateral estoppel (*e.g.*, efficient administration of justice, avoidance of conflicting judicial determinations, avoidance of harassment through repetitive litigation) would also be served is not dispositive of the question. We must satisfy ourselves additionally that the application of collateral estoppel would not compromise the interest of the State in the integrity of these proceedings.

■ Our conclusion that the criminal conviction here was intended by the Legislature to conclusively establish Judge Coruzzi's guilt is to some extent based on the identical effect given to such convictions in attorney disciplinary matters. Long before the 1970 adoption of the judicial removal statute, the rule was firmly established that the conviction of an attorney conclusively established the underlying facts in disciplinary proceedings. *In re Hughes*, 90 *N.J.* 32, 36 (1982); *In re Mirabelli*, 79 *N.J.* 597, 601–02 (1979); *In re Mischlich*, 60 *N.J.* 590, 593 (1972); *In re Isserman*, 9 *N.J.* 316, 321 (1952), *cert.* den. *sub nom. Isserman v. Ethics Committee*, 345 *U.S.* 927, 73 *S.Ct.* 706, 97 *L.Ed.* 1357 (1953). We assume that the Legislature was aware of that fact when it enacted the removal statute. *Yanow v. Seven Oaks Park, Inc.*, 11 *N.J.* 341, 350 (1953). In the absence of any evidence to the contrary, we also assume that the Legislature intended convictions to have the same effect in judicial removal proceedings which, while unique, are similar in some significant respects to attorney disciplinary proceedings. In both an officer of the law is subject to removal, in both the integrity of the judicial system is at stake, in both the burden of proof exceeds a preponderance of the evidence, and in both the destruction of a professional career is involved. The Legislature, thus charged with knowledge of the conclusive effect given to criminal convictions in ordinary civil cases and in attorney disciplinary cases, might have contemplated the same effect in judicial removal proceedings.[7]

■ Considerations of policy greatly strengthen this conclusion concerning legislative intent. Without question, the most significant goal of judicial removal statutes is the preservation

---

[7]While the burden of proof in attorney disciplinary cases ("clear and convincing") is lower than "beyond a reasonable doubt," the cases do not suggest that the conclusive effect given to convictions is based on a suggested safety margin resulting from that difference. The important consideration is that the binding determination resulted from a trial where the burden was no *less* than the disciplinary proceeding.

of the public's confidence in the judicial system. *See In re Spitalnick,* 63 *N.J.* 429, 431–32 (1973); *Nicholson v. State Comm'n on Judicial Conduct,* 50 *N.Y.2d* 597, 608, 409 *N.E.2d* 818, 822, 431 *N.Y.S.2d* 340, 345 (1980); *In re Martin,* 295 *N.C.* 291, 300–302, 245 *S.E.2d* 766, 772 (1978); *In re Heuermann,* 90 *S.D.* 312, 240 *N.W.2d* 603, 608 (1976). That confidence is shaken when a judge commits an offense that subjects him or her to removal; the removal proceedings are designed to restore faith. The "acquittal" by this Court of a judge previously convicted by a jury would have a shattering impact on that faith. The incomprehensible scene of a unanimous conviction by twelve of his peers, after a trial in which the judge is afforded every conceivable protection, followed by an acquittal by this Court, perhaps by a 4–3 vote, would overwhelm all attempts at analysis or justification. The niceties of distinctions between a jury and this Court would be totally lost by the public. Nor would matters be helped when our order permitting the resumption of his judicial functions was delivered to the place where he was serving his prison sentence. The public might conclude that the judge succeeded where he had previously failed because the jury was composed of citizens and the Court composed of judges.

■ In our view, the Legislature would never countenance even the possibility of such a result. The situation might conceivably be different if some significant new evidence were to be discovered after conviction and after all appeals had been exhausted, or if the underlying proceedings had been clearly contaminated by fraud or criminality on the part of the prosecution, the judge, or the jury, or something of that kind. But there is nothing of that even remotely suggested here. All we have is the contention that, as a matter of law, the statute requires a completely independent proceeding, a full and new trial before the Supreme Court, and, presumably, a total disregard of the prior conviction by the jury. For the reasons stated above, we disagree. In these proceedings the conviction is

conclusive as to guilt and as to all facts on which it is based.[8]

Respondent's contention that this Court should disqualify itself *in toto* requires only a brief response. First of all, we doubt that the New Jersey Constitution in granting the power of removal to "the Supreme Court" (art. VI, § VI, para. 4) intended the power to be exercised by a court composed exclusively of judges of other courts. We suspect that even if grounds existed for disqualification of the entire Court, the rule of necessity would nevertheless require that the entire Court hear the matter. *See Traction Co. v. Board of Public Works,* 56 *N.J.L.* 431, 439–40 (Sup.Ct.1894); *New Jersey State Bar v. New Jersey Ass'n of Realtor Bds.,* 118 *N.J.Super.* 203, 209 (Ch.Div.1972); *accord United States v. Will,* 449 *U.S.* 200, 101 *S.Ct.* 471, 66 *L.Ed.2d* 392 (1980).

Furthermore, on the merits, there is absolutely nothing here that would require anyone to be disqualified. Respondent's counsel points to the language of the initial complaint, filed by the Court, which, in conclusory terms, alleges that respondent is guilty of bribery. The difference between such formal allegations contained in a complaint and the assertion of a belief by this Court or any of its members in the facts alleged is too obvious to require further comment. This Court prejudged nothing about respondent. We simply reacted, and appropriately we believe, to matters brought to our attention that in our judgment, called for the institution of removal proceedings. The removal statute explicitly authorizes such action. *N.J.S.A.* 2A:1B–3.

---

[8]Obviously we do not intend here to list every conceivable situation where the Court might examine the soundness of the conviction. We note that *In re Isserman,* 35 *N.J.* 198 (1961), is mistakenly cited as authority to reexamine a conviction that led to disbarment. In fact the soundness and basis for that conviction were not reexamined at all, nor was there any suggestion that the conviction there was not conclusive in the disciplinary proceedings. It was the Court's previous value judgment—that such a conviction warranted disbarment—that was reexamined in light of subsequent developments that rendered disbarment unjust.

■ The remaining contention of respondent is that one or more members of the Court, perhaps all—the contention is not that specific—should be disqualified for having in some way participated in the prosecution of respondent. His contention rests on his unsupported belief that evidence of Court involvement in his prosecution will turn up, creating an improper appearance of partiality. This proposition is too tenuous to warrant disqualification. Discovery is sought on this issue, the only complaint being that such discovery has been denied the respondent. But no such denial ever occurred, since no such request for discovery was ever made. The first occasion on which it is suggested that such discovery is needed is found in respondent's brief before this Court. That is obviously neither the right time nor place to initiate such a request. Furthermore, where discovery is sought of those holding high office, there must be, at the very least, a solid showing of the need for and relevance of the predicted testimony. *Hyland v. Smollok,* 137 *N.J.Super.* 456 (App.Div.1975), *certif. den.* 71 *N.J.* 328 (1976) (request to depose Attorney General denied, absent showing that Attorney General had relevant knowledge and that deposition was essential to prevent injustice).

■ A claim based on the denial of discovery must indicate the matter which the applicant hopes will be developed. Here we have nothing more than the general assertion of some kind of involvement in the prosecution.[9]

### The Statutory Amendment

As noted above, Judge Coruzzi has been suspended without pay since the commencement of the removal proceedings. When those proceedings were instituted, the statute authorizing them

---

[9]We recognize that a decision to deny discovery regarding alleged involvement of this Court, based on our assessment of its importance to prevent injustice, may have the ring of an *ipse dixit.* However, the same is true of all recusal decisions—ultimately, the Court's honesty and integrity in exercising its discretion must be trusted.

allowed for withholding of pay for a period not to exceed 90 days. The legislative intent in imposing that 90-day limitation is not known. It may have reflected a mistaken belief that removal proceedings would be concluded within the 90-day period; however, it is most unlikely that removal proceedings would be that short.[10] The Legislature never intended to allow the Court to suspend the judge without pay, presumably contemplating a situation where the judge's conduct was so bad and the probability of conviction sufficiently strong to warrant this extreme temporary remedy of withholding pay, only to have pay restored long before it was even possible that the judge would be exonerated. At the commencement of the removal proceedings, therefore, the 90-day limitation seemed incongruous, and we have learned nothing that would explain away its apparent inappropriateness.

The Legislature, aware of the Coruzzi arrest and the commencement of removal proceedings, amended the statute to allow for the indefinite withholding of pay pending removal proceedings, and did so before the expiration of the 90-day suspension in this case. Respondent argues that since at the time of the offense, or perhaps at the time of the commencement of the removal proceedings (and at one point it is even suggested that the critical moment was when Judge Coruzzi became a judge), withholding of pay was limited to 90 days, that limitation somehow was a right of Judge Coruzzi, a vested interest, a condition of his position that could not be changed, and certainly not at a time when he had already become subject to removal proceedings. The legal contention is that where such

---

[10]Removal proceedings, if commenced after a judge's conviction, would take much less time than they did here, where they were commenced one day after arrest. Even then, however, 90 days would not be enough. Presumably suspension without pay would occur immediately upon conviction. Since the appellate process would take much more than 90 days, even this procedural change, which would lead to the least period of time being taken in the removal proceedings, would still result in proceedings far in excess of 90 days.

amendment was aimed specifically at him, it constituted either an *ex post facto* law, a bill of attainder, or an impermissible impairment of contract.

█ The fact that a law is triggered by a specific event, the fact that the Legislature realizes the law will apply to that event as well as the persons involved in it, certainly does not—or should not—affect the validity of legislation. A significant portion of all laws and amendments passed by a legislature have their origin in just such specific circumstances. Anti-pollution laws are sometimes passed not in response to some theoretical state of affairs, but to pollution from a particular factory; workers' compensation laws result not from some generalized enlightened ideal but rather from observing the plight of worker after worker, particular people, being injured at particular factories and going without fair or expeditious compensation. And these laws do not always get amended as a result of academic speculation concerning their adequacy but rather from experience with a particular situation that demonstrates their inadequacy. If legislation triggered by a particular situation clearly requiring a legislative remedy is invalid for that reason, the law would be helpless to address many societal needs.

Here the Legislature undoubtedly learned from the Coruzzi arrest and removal proceedings that it had made inadequate provisions for withholding pay of a suspended judge.[11] Without doubt Judge Coruzzi was one object of its attention; without doubt it did not want Judge Coruzzi to be paid until the removal proceedings were concluded; but equally without doubt its intention was to assure that any judge and all judges who were the subject of removal proceedings might, in appropriate situa-

---

[11] At the request of the Court, the Administrative Office of the Courts advised the appropriate legislators of the problem.

tions, be suspended without pay indefinitely pending the completion of those removal proceedings.

What conceivable interest is served by limiting this otherwise obviously legitimate legislative power and preventing it from applying to the very situation that called the Legislature's attention to the statute's inadequacy? Was there some reliance on the statute by Judge Coruzzi when he accepted a bribe? Did he have some legitimate expectation that no one could relieve him of pay for more than 90 days if he were caught? And if there were any such expectation or reliance, what legitimate interest would be served by honoring it? While the constitutional prohibition of *ex post facto* laws is treated hereafter, it should here be noted that the true source for that prohibition is the strong and universally accepted notion that a fair and just society cannot make criminal an act that was innocent when it occurred nor, if criminal when it occurred, impose punishment in excess of that called for when it occurred. But removal is not punishment for a crime, nor is suspension, nor is the withholding of pay. The purpose of the removal proceedings, and all related aspects of those proceedings, is to regulate the judiciary, to protect the public from dishonest judges, to prevent proven dishonest judges from doing further damage, and above all to assure the public that the judiciary is worthy of its trust. That purpose, clearly regulatory, is achieved not only by the removal proceeding itself, but also by the immediate suspension of the judge without pay. Were pay to be resumed before the removal proceedings were completed, public confidence in the judiciary would without doubt be weakened.

These considerations suggest the legitimacy of the legislative action, and an analysis of the constitutional objections raised by respondent confirms that legitimacy. Article I, § 10, cl. 1 of the United States Constitution prohibits states from enacting *ex*

post facto laws.[12] *N.J. Const.* of 1947, art. IV, § VII, para. 3 imposes a similar prohibition.[13]

The essence of the prohibitions is to forbid states to enact any law that imposes a punishment for an act that was not punishable at the time it was committed, or that imposes additional punishment to that then prescribed. *Cummings v. Missouri,* 71 *U.S.* (4 Wall.) 277, 325–26, 18 L.Ed. 356 (1867). This bar applies only to statutes that are by their nature penal. *Id., accord Bonney v. Collector of Bridgewater,* 31 *N.J.L.* 133 (Sup. Ct.1864). But if the restriction of the individual occurs as an incident of the regulation of a present situation, it is not an *ex post facto* law. *DeVeau v. Braisted,* 363 *U.S.* 144, 160, 80 *S.Ct.* 1146, 1155, 4 *L.Ed.*2d 1109, 1120 (1960).

There is strong support for the proposition that the purpose of judicial disciplinary and removal proceedings is not penal. *See, e.g., McComb v. Commission on Judicial Performance, supra,* 138 *Cal.Rptr.* at 463–65, 564 *P.2d* 1. Indeed, respondent concedes that the statute, including the controversial amendment, is regulatory in its effect as to future employees. However, he ignores the *purpose* of the statute and emphasized only its *effect* on him—that it operates to deprive him of his salary.

This analysis misses the mark.

> The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualification for a profession. [*DeVeau v. Braisted,* 363 *U.S.* 144, 160, 80 *S.Ct.* 1146, 1155, 4 *L.Ed.2d* 1109, 1120 (1960)].

One does not have a constitutional right not to be subject to a law if its effect might be called punitive. The Constitution only provides that when a statute engenders unpleasant consequences

---

[12]"No state shall ... pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts ...." *U.S. Const.* art. I, § 10, cl. 1.

[13]"The Legislature shall not pass any bill of attainder, ex post facto law or law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made." *N.J. Const.* of 1947, art. IV, § VII, para. 3.

for an individual because of a past act, punishment cannot be the purpose of a statute. The appropriate focus is not simply the effect on the individual challenging the statute but also other potential or intended objects of the law's operation to determine if the challenged restriction serves a valid regulatory purpose.

The regulatory purpose that *L.*1981, *c.* 522 serves is evident: it helps the Supreme Court to preserve public confidence in the judiciary by not allocating public funds to pay salary to members of the judiciary who have conducted themselves in a manner that warrants suspension. Equally in its application to respondent based on his acts prior to the law's passage as in its potential application to others in the future, the law advances this goal. That preservation of public confidence is a valid and important aspect of the regulation of the judiciary. *See In re Spitalnick,* 63 *N.J.* at 431–32. Judge Brotman considered this point in reaching his conclusion that the amendment was not an *ex post facto* law:

Maintenance of the standards of the profession and protection of the public are the essential characteristics of the legislation in question. These are regulatory in nature and the deprivation of salary inflicted on plaintiff as a result was but a necessary concomitant of the effective operation of this regulatory system. [*Coruzzi v. New Jersey,* No. 82–535 (May 13, 1982), slip op. at 4].

*L.*1981, *c.* 522 was enacted with a legitimate regulatory purpose and is therefore not an *ex post facto* law.

The second of respondent's constitutional claims is that *L.*1981, *c.* 522 is a bill of attainder in violation of the United States and New Jersey Constitutions.[14] A bill of attainder is a legislative act which levies punishment against specified individuals or groups without judicial trial. *United States v. Brown,* 381 *U.S.* 437, 448–49, 85 *S.Ct.* 1707, 1714–15, 14 *L.Ed.*2d 484, 492 (1965); *United States v. Lovett,* 328 *U.S.* 303, 315, 66 *S.Ct.* 1073, 1078, 90 *L.Ed.* 1252, 1259 (1946); *In re Disciplinary Proceedings Against C. Schmidt & Sons, Inc.,* 79 *N.J.* 344, 356–57 (1979).

---

[14]*See supra* at 577–578 nn. 12–13.

The substitution of a legislative determination of guilt for a judicial one is the distinguishing feature of a bill of attainder. *In re Disciplinary Proceedings against Schmidt,* 79 *N.J.* at 356, citing *DeVeau v. Braisted,* 363 *U.S.* at 160, 80 *S.Ct.* at 1155, 4 *L.Ed.*2d at 1120. An amendment that does no more than permit the Supreme Court to continue to withhold judges' salaries pending completion of removal actions (beyond the 90-day period already authorized) hardly meets the description of a legislative determination of a person's guilt. The amendment to *N.J.S.A.* 2A:1B–5 permits extension of a *temporary* deprivation only and in no way supplants the proceeding for ultimate determination of a judge's suitability for office or presupposes guilt.

The amendment is instrumental to preserve public confidence regardless of whether the judge is ultimately found fit for office.[15] The law's valid regulatory purpose and the lack of punitive purpose accompanying its enactment rebut inferences essential to sustain respondent's bill of attainder claim. *Nixon v. Administrator of Gen'l Serv.,* 433 *U.S.* 425, 475–76, 97 *S.Ct.* 2777, 2806–07, 53 *L.Ed.*2d 867–68 (1977); *In re Disciplinary Proceedings against Schmidt, supra,* 79 *N.J.* at 355. While it is obvious that Judge Coruzzi's arrest brought to the Legislature's attention the effect of the 90-day proviso in *N.J.S.A.* 2A:1B–5, this catalytic role does not make the law constitutionally infirm. There can be no doubt that "a law of general applicability is not unconstitutional merely because its enactment was inspired by a specific example of the evil which it seeks to suppress." *Collin v. Smith,* 447 *F.Supp.* 676, 682 n. 4 (N.D.Ill.) (dictum), aff'd, 578 *F.*2d 1197 (7th Cir.), *cert.* den., 439 *U.S.* 916, 99 *S.Ct.* 291, 58 *L.Ed.*2d 263 (1978).

The third constitutional violation claimed by respondent is that the amendment of *N.J.S.A.* 2A:1B–5 impairs an obligation

---

[15]If the removal charges are not sustained, the judge would presumably be entitled to back pay.

of contract. *U.S. Const.* art. I, § 10, cl. 1; *N.J. Const.* of 1947, art. IV, § VII, para. 3.[16] Respondent argues that he has a "contractual" right to receive salary while suspended after 90 days without pay. This right, he asserts, was endowed by *N.J.S.A.* 2A:1B–5 and was subsequently impaired by the amendment of that statute.

█ It is well established that public officers do not have "contractual" rights to specific terms of compensation and employment within the meaning of the Contract Clause. *Butler v. Pennsylvania,* 51 *U.S.* 402, 10 *How.* 402, 13 *L.Ed.* 472 (1850); *Springfield v. Pederson,* 73 *N.J.* 1, 5 (1977). This rule has been applied specifically to judicial office. *Kenny v. Hudspeth,* 59 *N.J.L.* 320, 322 (Sup.Ct.) aff'd, 59 *N.J.L.* 504 (E. & A.1897); *Kingston v. McLaughlin,* 359 *F.Supp.* 25, 29 (D.Mass.1972), aff'd, 411 *U.S.* 923, 93 *S.Ct.* 1900, 36 *L.Ed.2d* 388 (1973).

█ Further, the Constitution bars only impairments that are severe and are not reasonably necessary to serve important public purposes. *Allied Structural Steel Co. v. Spannaus,* 438 *U.S.* 234, 98 *S.Ct.* 2716, 57 *L.Ed.2d* 727 (1978); *United States Trust Co. v. New Jersey,* 431 *U.S.* 1, 97 *S.Ct.* 1505, 52 *L.Ed.2d* 92 (1977); *Fidelity Union Trust Co. v. New Jersey Hwy. Auth.,* 85 *N.J.* 277, 288, app. dism., 454 *U.S.* 804, 102 *S.Ct.* 76, 70 *L.Ed.2d* 73 (1981).

█ We need not expound again the importance of the purpose served by the amendment of *N.J.S.A.* 2A:1B–5 in order to support our conclusion that the law does not unconstitutionally impair any contractual right of respondent.

## Conclusion

We rule that the statutory amendment is valid. Furthermore, we find beyond a reasonable doubt that Judge Coruzzi engaged in misconduct in office. We therefore remove him from office

---

[16]*See supra* at 577–578 nn. 12–13.

effective immediately. He shall not hereafter hold judicial office.

*For removal:* Chief Justice WILENTZ, and Justices CLIF-FORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed:* None.