777 A.2d 323

IN THE MATTER OF JUDGE ROSEMARIE R. WILLIAMS,
A JUDGE OF THE SUPERIOR COURT OF THE
STATE OF NEW JERSEY.

Argued February 13, 2001—Decided July 31, 2001.

*Patrick J. Monahan, Jr.*, Designated Presenter, argued the cause on behalf of Advisory Committee on Judicial Conduct.

*Justin P. Walder* argued the cause for respondent (*Walder, Sondak & Brogan*, attorneys; *Mr. Walder* and *Jeffrey A. Walder*, of counsel and on the brief).

The opinion of the Court was delivered by

PORITZ, C.J.

In this judicial disciplinary case participating members of the Advisory Committee on Judicial Conduct (ACJC or Committee) have concluded that respondent Superior Court Judge Rosemarie Ruggiero Williams has violated Canons 1 and 2A of the *Code of Judicial Conduct* and *Rule* 2:15–8(a)(6). By presentment filed with the Court, four members of the Committee recommend public censure as an appropriate sanction and, further, that Judge Williams continue to receive psychological counseling. Two members of the Committee, however, recommend that removal proceedings should be instituted pursuant to *Rule* 2:14 and *N.J.S.A.* 2B:2A–1 to –11, and one member recommends a suspension for six months.

On initial review of the presentment, the Court issued an Order to Show Cause why respondent should not be subject to removal proceedings or otherwise disciplined, and the matter was scheduled for oral argument. We now concur in substantial part with the findings of the ACJC majority but modify its recommendation in respect of discipline. Under our disposition Judge Williams shall be suspended from her judicial duties for a period of three months commencing on August 13, 2001, and shall forfeit her salary during that period.

# I

This matter arose when the ACJC issued a formal complaint against respondent alleging, in two separate counts, violations of Canons 1 (requiring that judges personally observe high standards

of conduct so that the integrity and independence of the judiciary may be preserved), and 2A (requiring judges to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary) of the *Code of Judicial Conduct* and *Rule* 2:15–8(a)(6) (prohibiting conduct prejudicial to the administration of justice that brings the judicial office into disrepute). The first count asserts that respondent engaged in judicial misconduct when, on April 14, 2000, she confronted Alfred Wesley Bridges, with whom she previously had a romantic relationship, and Tami DeVitis, his companion that evening, at the Revere Restaurant in Ewing Township and, later, at Joe's Mill Hill Saloon in Trenton. The second count asserts that respondent engaged in judicial misconduct when she gave false and misleading information to the Trenton police and when she "identified herself as a representative of the Hopewell Police Department" in a telephone call to the Mill Hill. Respondent denies any judicial misconduct and, more specifically, that she lied to the police or pretended to be a police officer. She maintains that her behavior on April 14, 2000, "should properly be evaluated in the context of what had been a longstanding abusive relationship" with Bridges.

In accordance with *Rule* 2:15, the Committee conducted a formal public hearing on the complaint. With the approval of the Court, portions of reports by two psychologists and a therapist containing certain personal background information were entered into the record as confidential. During the four-day hearing, various witnesses provided testimony in support of the allegations in the complaint, including Bridges; DeVitis; Dennis Clark, the owner of the Mill Hill Saloon; Thomas Keefe, a bartender at the Mill Hill; and Trenton Police Officer Robert O'Hare. Respondent testified on her own behalf and presented testimony from Assistant Deputy Public Defender Joan Austin; Assignment Judge Robert E. Guterl (Somerset/Hunterdon/Warren Vicinage);[1] Judge Anthony Parrillo, Presiding Judge, Chancery Division, Gen-

---

[1] Judge Guterl died on May 26, 2001.

eral Equity Part (Mercer Vicinage); Pam Fruscione, respondent's secretary in Mercer County; and Scott Krasny, President, Mercer County Bar Foundation. Relevant portions of that testimony were summarized by the ACJC and will be briefly presented herein.

## II

From the time of her appointment to the bench on March 5, 1993, up to March 5, 2000, respondent served as a Superior Court Judge in the Mercer Vicinage.[2] She sat in the Mercer County Courthouse, where Bridges, an investigator with the Mercer County Sheriff's Department, also worked. Starting around April 1998, respondent and Bridges became romantically involved, but by April 14, 2000, that relationship had apparently ended. For at least a year prior to that date, respondent and Bridges had been abusive and confrontational toward one another.

On the night of April 14, respondent was having dinner with Assistant Deputy Public Defender Joan Austin at the Revere Restaurant. She noticed Bridges enter the restaurant accompanied by Tami DeVitis, a woman respondent did not know. Respondent was upset by their presence because she believed that Bridges had entered the restaurant knowing that she was inside and that she would be upset. Her car, a blue Land Rover with a bicycle rack, was parked directly in front of the Revere and would have been recognized by Bridges since he had driven it on a number of occasions. Bridges' knowledge of respondent's presence was later confirmed by Tami DeVitis who stated that on their way in to the Revere, Bridges commented that there might be "drama" inside.

---

2 Judge Williams was reappointed to the bench after a break in service from March 5, 2000, to March 23, 2000. On taking the oath of office after her reappointment, she was assigned to the Law Division, Civil Part, Somerset County (Somerset/Hunterdon/Warren Vicinage).

After Bridges and DeVitis entered, respondent left her dinner table and confronted Bridges in the back of the restaurant. She told him that it was not appropriate for both of them to be there and that he should be the one to leave because she was in the middle of her meal. Respondent was emotional and acknowledged pulling Bridges' shirt although she claimed that happened when Bridges "shoved [her] away from him." At some point during the evening, Bridges' shirt was torn. Although DeVitis claims that respondent spoke to her using sexually explicit language, respondent denies any confrontation with DeVitis and there were no witnesses to the alleged encounter.

Both Bridges and DeVitis left and respondent followed them out to the parking lot. Another confrontation took place, in which respondent asked whether DeVitis was "with [Bridges]" and Bridges told respondent that he was taking DeVitis to Lorenzo's Restaurant and would return in five minutes. Bridges later testified that he lied to respondent in order to end the confrontation. Bridges and DeVitis then left and respondent returned to the Revere. She indicated to Austin that she would go home rather than wait for Bridges, and the women then paid their bill and also left.

Instead of going home, however, respondent drove in the opposite direction toward Lorenzo's Restaurant. On her way, she saw Bridges and DeVitis entering the Mill Hill Saloon and stopped her car. Respondent testified that when Bridges saw her approach, he yelled at her, threatening to have her arrested and to see to it that she lost her job. Pam Fruscione, respondent's former secretary, corroborated respondent's testimony in respect of Bridges' behavior. Respondent had called Fruscione from the car on a cell phone and Fruscione could overhear Bridges' threats.

Bridges and DeVitis entered the Mill Hill where Bridges asked the owner to call the police. Respondent left her car at the curb and followed them inside. She heard Bridges' request and knew that Dennis Clark, the proprietor, was on the phone, presumably with the police. A heated exchange then developed between

respondent and Bridges. Although no witness heard what was said, respondent was observed gesturing and pulling on Bridges' arm or shirt sleeve. When respondent turned to leave, she and DeVitis screamed at each other, but their testimony as to who started that encounter differs. DeVitis testified that respondent called her a vulgar name after shouting obscenities at her and eliciting a similar response from DeVitis. Respondent testified that DeVitis shouted at her and that she said something "not pleasant" to herself without intending to be heard. No witnesses heard respondent or DeVitis, nor did DeVitis mention the encounter to the police when they questioned her.

Respondent then left the Mill Hill and drove two blocks to the front entrance of the Richard J. Hughes Justice Complex. From there she called 911 on her cell phone. She gave the operator her name and location and said that there had been a confrontation at the Mill Hill after Bridges had followed her there. The 911 tape does not indicate, as the ACJC complaint alleges, that she misidentified herself as the person who had made the initial 911 call from the Mill Hill. Respondent did not at that time state that she was a Superior Court judge.

The police officers, who were already on their way to the Mill Hill, were rerouted to the Justice Complex. When the police arrived, respondent again represented that Bridges had followed her to the Mill Hill. She waited at the Justice Complex while the police went to the Saloon where Bridges and DeVitis each gave a statement. Both declined to file a complaint against respondent. When the police returned to the Justice Complex, respondent similarly declined to file a complaint.

Thomas Keefe, the bartender at the Mill Hill, testified that at some point after the police officers left there, he answered a call from a woman who identified herself as a police officer from the Hopewell Police Department and asked to speak to Bridges. When Bridges took the phone from Keefe, however, he immediately recognized the voice as respondent's and hung up. According to respondent's testimony, she told the bartender that she was

calling from the Hopewell Police Department because she was near there. A tape-recorded telephone message indicates that after her call to the Mill Hill, respondent called Bridges' home and said she was on route to the Hopewell Police Department. She then called the Mill Hill a second time and apologized to the owner. At some point thereafter she arrived at the Hopewell Police Department and gave a statement to the police. She informed them that Bridges had a gun, but again declined to file a complaint.

## III

### A

Judicial disciplinary matters "before this Court on the presentment of the ACJC receive a *de novo* review of the record and are subject to a clear-and-convincing standard of proof." *In re Seaman,* 133 *N.J.* 67, 74, 627 *A.*2d 106 (1993). "Clear-and-convincing evidence is that which produce[s] ... a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the precise facts at issue." *Ibid.* (citations and internal quotations omitted). In our review, we independently determine whether the record satisfies that demanding burden of proof. *Id.* at 74–75, 627 *A.*2d 106. Our inquiry is "whether the facts ... demonstrate conduct ... that is incompatible with" the canons of judicial conduct. *Id.* at 75, 627 *A.*2d 106.

In this matter, the facts were sharply contested. Witnesses to and participants in the incidents of April 14 gave disparate accounts of what actually happened and what was said. In some instances, the testimony suggests that witnesses viewed what they saw and heard from such different perspectives that they understood the same events differently. At times those variations were substantial. In such cases, the clear and convincing standard of proof may be difficult to meet. That is as it should be in a case

involving allegations that a judge has violated the canons of our Code. The seriousness of such a claim, and the possible consequences to the judge, require that we have a clear and accurate understanding of facts that may give rise to discipline.

## B

Canons 1 and 2A of the *Code of Judicial Conduct* provide, respectively:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.
>
> [Canon 1.]
>
> A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
>
> [Canon 2A.]

Canons 1 and 2A are clear: judges in this State are held to "high standards of conduct" because, otherwise, we risk the "integrity and independence of the judiciary."[3]  As the comment to Canon 2A explains,

> [p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety and must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on personal conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

## C

On the night of April 14, 2000, Judge Williams acted in such manner as to bring disrepute on herself and on the judiciary. Despite the differences in the testimony about the events of that night, certain core facts stand out and are accepted by us as

---

[3] *Rule* 2:15–8(a)(6) requires ACJC review of any claim "that a judge ... is guilty of ... conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

having been proved by clear and convincing evidence.[4]  Respondent accosted Alfred Wesley Bridges and Tammy DeVitis at the Revere Restaurant and in the parking lot in a confrontational and angry manner.  She wanted them to leave because she was not yet finished with her dinner and apparently because she believed they could not all dine in the same restaurant.  But the Revere is a public place open equally to respondent and to Bridges and his companion.  Whether Bridges knew she was there because of the location of her car is irrelevant, even if true, since there was no order restraining him from any contact with respondent.

Respondent admits that she attempted to follow Bridges into Trenton.  Provoked by Bridges outside the Mill Hill, she chose to follow him inside and confront him a third time.  Although the witnesses' accounts of what happened there diverge to some extent, we find that respondent again acted with hostility towards Bridges, and then DeVitis, in a public place where others could observe her, and that she pulled on Bridges' arm in her vehemence.  She also admits that she knew the owner of the Mill Hill called the police at the request of Bridges and chose, by calling 911 herself, to divert the officers to the Justice Complex where she could tell her own story.  She twice gave false and misleading information, first, when she stated to the police operator that Bridges had followed her, and subsequently, when she repeated that statement to the police.  We agree with the ACJC that her explanation is incredible.  She knew that she had followed Bridges into Trenton and not the other way around.

Later, when she called the Mill Hill from her car, she again reshaped the truth to her own ends.  We agree with dissenting

---

[4] We note that in a judicial disciplinary proceeding "uncorroborated evidence may satisfy ... the standard of clear-and-convincing evidence."  *In re Seaman, supra,* 133 *N.J.* at 84, 627 *A.2d* 106.  Here the ACJC majority did not find clear and convincing evidence to establish certain alleged and uncorroborated facts, *i.e.,* that respondent, in the Revere Restaurant, spoke to DeVitis using vulgar language.  We find it unnecessary to consider whether the burden of proof has been met in respect of certain allegations because the facts at issue are cumulative only and would not alter our disposition in this matter.

Committee members Teresa Kluck and Robert McAllister that respondent "pretended to be a [Hopewell] police officer in order to ensure that Bridges would take her call. . . ." She could accomplish that deception, however, by simply stating she was calling from the Hopewell Police Department. Once again, the record demonstrates that, at best, she created a fiction related to her location, and therefore her status, so that she could continue her destructive contact with Bridges.

Respondent's conduct was irresponsible. She did not conform her behavior to the social norms expected of ordinary citizens in our society and certainly not to the heightened standard we expect of judges. Although her actions were related only to her private life, they took place in public where others, knowing of her status as a judge, could lose confidence in the integrity and impartiality of the judiciary. Moreover, as the ACJC found, when respondent misled the police, she subordinated her responsibility to act in conformance with the law to her own personal concerns and needs. She demonstrated a lack of respect for the law that as a judge she has sworn to uphold. Likewise, when she called the Mill Hill and misrepresented her status, she came dangerously close to impersonating a police officer. Those actions suggest a lack of judgment that is both "prejudicial to the administration of justice [and] brings the judicial office into disrepute." *R.* 2:15-8(a)(6).

Based on our independent review of the record, we conclude that there is clear and convincing evidence demonstrating that, on the evening of April 14, 2000, respondent violated Canons 1 and 2A of the *Code of Judicial Conduct* and *Rule* 2:15-8(a)(6).

## IV

### A

■ Our inquiry now turns to the discipline to be imposed, considering the findings of the Court and the resulting determination that respondent has violated the canons and rules. Our deliberations on that question are informed by the purpose that

underlies the restrictions imposed on judges' conduct. As we said in *In re Seaman, supra:*

> The single overriding rationale behind our system of judicial discipline is the preservation of public confidence in the integrity and the independence of the judiciary. *See In re Coruzzi,* 95 *N.J.* 557, 579, 472 *A.*2d 546 (1984); *In re Spitalnick,* 63 *N.J.* 429, 431, 308 *A.*2d 1 (1973). As we have noted before, "This Court cannot allow the integrity of the judicial process to be compromised in any way by a member of either the Bench or the Bar." *Spitalnick* [,] *supra,* 63 *N.J.* at 431, 308 *A.*2d 1. Accordingly, institutional concerns figure prominently in cases involving judicial discipline. As the Supreme Court of Minnesota has observed, the standard of judicial conduct is a high one precisely "so that the integrity and independence of the judiciary may be preserved." [*In re*] *Miera,* 426 *N.W.*2d [850,] 855 [(Minn.1988)].... Because public confidence in judges is essential to maintaining the legal system, "misconduct by a judge brings the office into disrepute and thereby prejudices the administration of justice." [*In re Winton,* 350 *N.W.*2d 337, 340 (Minn.1984).]
>
> [133 *N.J.* at 96–97, 627 *A.*2d 106.]

■ Our primary concern in determining discipline is therefore not the punishment of the judge, but rather to "restore and maintain the dignity and honor of the position and to protect the public from future excesses." *Id.* at 97, 627 *A.*2d 106 (quoting *In re Buchanan,* 100 *Wash.*2d 396, 669 *P.*2d 1248, 1250 (1983)); *see also In re Yaccarino,* 101 *N.J.* 342, 386–87, 502 *A.*2d 3 (1985) (stating that purpose of judicial discipline is "not penal in nature ... but rather serves to vindicate the integrity of the judiciary"). We once before adopted the reasons given by the Supreme Judicial Court of Maine for disciplining a judge. *In re Seaman, supra,* 133 *N.J.* at 97, 627 *A.*2d 106. Those reasons bear repeating here:

> [Judges engaging in misconduct must be disciplined] to instruct the public and all judges, ourselves included, of the importance of the function performed by the judges in a free society. We discipline a judge to reassure the public that judicial misconduct is neither permitted nor condoned. We discipline a judge to reassure the public that the judiciary of this state is dedicated to the principle that ours is a government of laws and not of men.
>
> [*Ibid.* (quoting *In re Ross,* 428 *A.*2d 858 (Me.1981)).]

## B

■ Four members of the ACJC have recommended that respondent be censured; two members have recommended that

she be removed; and one member has recommended that she be subject to a six-month suspension. Removal, as the most severe sanction, requires misconduct flagrant and severe. That sanction is imposed rarely. Willful misconduct in office and willful misuse of office are examples of transgressions that warrant removal of a sitting judge. Thus, recently, we ordered removal where the misconduct "corrupted ... judicial office to benefit ... personal interest and to punish [others] for personal reasons." *In re Samay*, 166 *N.J.* 25, 43, 764 *A.*2d 398 (2001). In that case, a municipal court judge issued a Temporary Restraining Order and a search and arrest warrant based on domestic violence complaints from a close acquaintance and, further, presided over the arraignment after having "fil[ed] criminal charges against his son's gym teacher." *Id.* at 42–43, 764 *A.*2d 398. In both instances, the judge misused the power of his office, thereby "undermin[ing] the proper administration of justice." *Id.* at 43, 764 *A.*2d 398.

Similarly, in *In re Yaccarino, supra,* we ordered removal where the judge misused judicial office to further personal and family interests, and where, in addition, the judge's misconduct was "repetitive" and "reflect[ed] a more flagrant lack of judicial fitness and insight than occasional lapses or poor judgment." 101 *N.J.* at 389–90, 502 *A.*2d 3. Judge Yaccarino, among other things, sought to acquire property below market-value from a litigant before him, used his office to influence municipal court proceedings involving his daughter, and held undisclosed prohibited business interests in liquor licenses. *Id.* at 353–86, 502 *A.*2d 3. "He clearly used his official position impermissibly ... [and] in a manner incompatible with his obligations as a judge and his judicial office." *Id.* at 390, 502 *A.*2d 3.

We ordered removal in *In re Coruzzi* because the judge had accepted a bribe. 95 *N.J.* 557, 472 *A.*2d 546 (1984). Chief Justice Wilentz, writing for the Court, spoke in the strongest terms about that abuse of judicial power:

> Society gives this power on condition that judges be independent, trusting them and no one else. Respondent sold this power, he sold his judgments, he sold his

independence. He not only betrayed his trust, he betrayed New Jersey's tradition of judicial honesty. . . .

*[Id. at 563, 472 A.2d 546.]*

And, in *In re Imbriani*, we ordered removal where the judge pled guilty to "Theft by Failure to Make Required Disposition of Property Received" in violation of *N.J.S.A.* 2C:20-9. 139 *N.J.* 262, 266, 652 *A.*2d 1222 (1995). Although the judge's criminal conduct did not touch on his judicial performance, in considering "the public interest" and our "steadfast commitment to maintaining an independent and incorruptible judiciary," we determined that removal was warranted on that criminal conviction. *Ibid.*

Respondent's conduct in the instant matter does not involve the misuse of judicial office such that it "poison[s] the well of justice" as in *In re Samay* and *In re Yaccarino*. Neither does her conduct include criminal acts that corrupt the judicial decision-making power as in *In re Coruzzi*, or that are "totally incompatible with continued judicial service" as in *In re Imbriani*. Respondent has committed serious violations but she has not directly and willfully misused her judicial office.

Although we deem removal to be too harsh in this case, we likewise deem censure, as proposed by the ACJC majority, to be too lenient. Censure does not reassure the public that judges will be deterred from "acting out" in public and that such behavior will not reoccur. The gravity of respondent's violations requires a strong response. Censure has been imposed, for example, in cases where the misconduct involved making inappropriate comments during judicial proceedings, *In re Albano*, 75 *N.J.* 509, 384 *A.*2d 144 (1978), and where the judge, without revealing his status, appeared on behalf of his son in legal proceedings, *In re Di Sabato*, 76 *N.J.* 46, 385 *A.*2d 234 (1978). Respondent's violations are more serious and require a discipline greater than censure if public confidence in the judiciary is to be maintained.

We agree with the ACJC that respondent has not established that "she suffers from a condition known as the battered woman's syndrome." The expert reports she submitted from the two

psychologists and the therapist who have had contact with her in the last eighteen months do not make a sufficient connection between battered woman's syndrome and her behavior. *Cf. State v. Kelly*, 97 *N.J.* 178, 193, 478 *A.*2d 364 (1984) (describing "common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives"). We find, based on both the expert reports and testimony at the hearing, that respondent lacked control over her behavior in her personal relationship with Bridges. Respondent has herself testified that she exercised "bad judgment."

Respondent's participation in that abusive and damaging relationship suggests that psychological counseling would be helpful to her. Indeed, she has been and continues in therapy to better understand her behavior.

Despite her personal problems, respondent performs well on the bench and has a reputation as a solid and fair judge. Her work with the Inns of Court and her conscientious attention to her judicial duties are commendable. She has served in three divisions of our court system—Criminal, Family, and Civil—in the eight years she has been a judge. Her transgressions are related to her personal life and her dysfunctional relationship with Bridges. Indeed, the picture that emerges from the record is of a person driven by strong emotions, who behaved inappropriately as a result of a flawed personal association.

Notwithstanding those mitigating factors, she has failed to adhere to the high standards we expect and demand of our judges. Her actions affected persons removed from the immediate controversy and her disregard for social norms negatively affects public confidence and brings discredit to the judiciary. Of greatest concern, she misled the Trenton police and, later, implied she was an official from the Hopewell Police Department. Moreover, the events of that night were not isolated. Prior incidents relating to respondent's relationship with Bridges are not before us except insofar as they bear on the quantum of discipline that should be

imposed. In one such incident a year earlier, respondent was physically injured during another confrontation with Bridges. Neighbors called the police and respondent filed and then withdrew a complaint against him. She was asked to seek therapy at that time and did so. Although she was reappointed, her reappointment was without tenure due to a break in service. *See N.J. Const.*, art. VI, § 6, ¶ 3 (stating that "[t]he Justices of the Supreme Court and the Judges of the Superior Court shall hold their offices for initial terms of [seven] years and upon reappointment shall hold their offices during good behavior"). Respondent has already paid a heavy price for her intemperate behavior.

## C

Having weighed the aggravating and mitigating factors, and because our primary concern must be to ensure the continued confidence of the public in the judiciary, the Court has determined that a three-month suspension is the proper discipline in this case. Arthur Kamin, a lay member of the ACJC, also deemed a suspension appropriate. In his dissent to the majority recommendation, he explained:

> To this day, the office of judge is one that I hold in high esteem and even awe. As a lay member of the ACJC, I truly believe the general public views our judges and justices in a like manner. They expect a quality of distinction and integrity in and out of the courtroom.
>
> Still, I must disagree with my ACJC colleagues in the types of sanctions they recommended be imposed. Censure, as proposed by the majority, is—in my opinion—too mild a discipline. Removal . . . is too harsh.
>
> What deeply concerns me is that Judge Williams severely damaged the stature of the judiciary in New Jersey by her extra-curricular activities. I expect judges to exercise good judgment. Judge Williams did not in this matter.
>
> . . . .
>
> But there is another side to Judge Williams. That must be taken into consideration as well. She appears to be a competent judge. She worked hard to get where she is. Her life has not been easy. She has surmounted many difficulties in her personal life and in her legal and judicial careers.
>
> I believe a sanction of suspension for six months would best serve the public interest. It would show New Jerseyans that the high standards of the judiciary will be maintained and that there will be a severe penalty if they are not adhered

to—beyond reprimand and beyond censure. A suspension has teeth to it for all to see.

Suspension also will offer a degree of compassion for a judge who is undergoing professional treatment to help solve her problems.

Judge Williams still can be a credit to our excellent state court system—and can serve as a shining example of someone determined to make a successful comeback after a period of difficulty and darkness.

We agree. However, we have chosen to suspend respondent for three rather than six months because of the constitutional prohibition against a judge, "while in office, engag[ing] in the practice of law or other gainful pursuit." *N.J. Const.,* art. VI, § 6, ¶ 6. Because of that restriction, we are concerned about the substantial adverse consequences of a longer suspension. We believe that the goal of our disciplinary system—enhancing public confidence in the judiciary—is furthered by a three-month suspension.

## V

In sum, we are satisfied from our independent review of the record that there is clear and convincing evidence that respondent violated Canons 1 and 2A of the *Code of Judicial Conduct* and *Rule* 2:15–8(a)(6). Accordingly, we hold that respondent shall be suspended for three months without pay from her judicial duties commencing on August 13, 2001, and that she shall be required to continue psychological counseling until further Order of the Court on application from respondent.

So Ordered.

LONG, J., dissenting

I would adopt the censure recommendation of the Advisory Committee on Judicial Conduct. We repose in that Committee, chaired by a retired Supreme Court Justice of long and rich experience and made up of highly regarded members of the legal community and the public at large, the responsibility of conducting formal hearings in cases such as this and, upon such hearings, the duty to recommend sanction.

That is what occurred here. After painstakingly reviewing the evidence, assessing the credibility of the witnesses and the weight to be accorded to their testimony, a majority of the Committee concluded that, on an historical discipline continuum, respondent's violation was less egregious than those that poisoned the well of justice, thus warranting removal, but more problematic than those wholly personal misjudgments that merely justified a reprimand.

Given that the conduct that led to these proceedings took place entirely within the setting of respondent's private life; that it did not touch on her judicial office; that she is uniformly regarded as a good and fair judge; that after seven years of hard work she has been denied tenure due to the fallout from the very same romantic misadventure; and that she has been subjected to unusual obloquy in the media, I am satisfied that the penalty of censure is appropriate. It will follow her to the end of her judicial life and, combined with continued counseling to uncover the root of the behavior that led her into these circumstances, is adequate and just.

As judges, we come to our task with the cares, the weaknesses, and the emotional needs that attend all human existence. Our duty is to recognize those impediments to proper judicial performance and, as far as is humanly possible, to act outside their influence. By and large our judges meet and exceed that expectation. If, from time to time, one of our number makes an error in judgment in his or her personal life, accepts due punishment, learns from that experience and is permitted to continue as a judicial officer, I do not believe the public's confidence in the integrity and independence of our institution will be shaken. Indeed it may be strengthened by the notion of the proportionality of the punishment assessed.

For the foregoing reasons, I respectfully dissent.

## ORDER

This matter having come before the Court on a presentment of the Advisory Committee on Judicial Conduct, and respondent

having been Ordered to Show Cause why she should not be disciplined, and good cause appearing;

IT IS ORDERED that JUDGE ROSEMARIE R. WILLIAMS is hereby suspended from the performance of her judicial duties, without pay, for three months, effective August 13, 2001, through November 12, 2001; and it is further

ORDERED that respondent shall continue to receive psychological counseling until the further Order of the Court.

*For suspension*—Chief Justice PORITZ and Justices STEIN, COLEMAN, VERNIERO and ZAZZALI—5.

*For censure*—Justice LONG—1.