**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED DECEMBER 28, 2001**

In re HON. SUSAN R. CHRZANOWSKI
JUDGE OF THE THIRTY-SEVENTH DISTRICT COURT,
WARREN, MICHIGAN.                                    No. 116721

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

The Judicial Tenure Commission (JTC) has recommended that we suspend respondent, 37th District Court Judge Susan R. Chrzanowski, for twelve months without pay for misconduct in the performance of her judicial duties. Respondent has filed a petition to reject this recommendation. We affirm the JTC's findings, and conclude that the JTC's recommendation of a one-year suspension of respondent is a reasonable one. Pursuant to MCR 9.225, we modify the recommendation of the JTC to require a six-month suspension without pay, beginning

January 1, 2002, in order to accord respondent partial credit for the seventeen-month interim suspension with pay that she has already served.

## I.  FACTS AND PROCEDURAL HISTORY

The bases for the JTC's complaint concern two aspects of respondent's conduct between April 1998 and August 1999. First, on a substantial number of occasions, respondent appointed then-attorney Michael Fletcher to represent indigent defendants, and presided over such cases, as well as presided over a criminal case in which Fletcher was retained counsel, without disclosing that she was engaged at the time in an intimate relationship with Fletcher.  Second, respondent made false statements to police officers investigating the August 16, 1999, murder of Leann Fletcher, Michael Fletcher's wife.[1]

Respondent and Fletcher met in 1996 and became friends in 1997.  In February of 1998, Fletcher entered the private practice of law.  Respondent began assigning him to represent indigent criminal defendants in misdemeanor cases in her court.  In July of 1998, respondent and Fletcher began an intimate relationship.  Throughout the course of their

---

[1]  In July 2000, a trial court convicted Fletcher of second-degree murder, finding that he shot and killed his wife, Leann.

2

subsequent relationship, between July 1, 1998, and August 15, 1999, respondent assigned Fletcher to fifty-six cases. Fifty-five of these cases, without a city attorney being present, resulted in guilty pleas accepted by respondent. These appointments generated in excess of $16,000 in income for Fletcher. In addition, respondent presided over *People v Donald Thomas Richards*, Case No W224162, in which Fletcher was retained counsel. Respondent entered an order dismissing the case against Fletcher's client. Respondent failed to disclose her ongoing relationship with Fletcher in any of these cases.

On August 16, 1999, Fletcher shot and killed his wife, Leann. Sometime after committing the murder, Fletcher telephoned respondent and left her a message. In the message, Fletcher asked respondent to call him when she returned home. Respondent received this message during the pre-dawn hours of August 17. Respondent then paged Fletcher, but received no response. She then left Fletcher a message, and he returned the call approximately one-half hour later. He told respondent that he could not talk, but that something "horrible" had happened. In the morning, respondent was informed by a co-worker that Leann Fletcher had committed suicide. Respondent went home early because she was too upset to complete her docket.

During the initial investigation of the murder, Hazel Park Police officers discovered evidence that respondent had been engaged in an intimate relationship with Fletcher. On August 17, the police interviewed respondent at her home. The interviewing detective asked respondent whether she had been involved with Fletcher. Judge Chrzanowski responded that she had. When questioned about the length of the relationship, respondent indicated that the relationship had begun in February of 1999 and had lasted only until March of 1999. The detective also asked respondent if she had spoken to Fletcher since the death of Leann, and respondent stated that she had not. Because respondent was emotionally distraught, the interview ceased.

On August 19, respondent went to the Hazel Park police station for a second interview. At this time, respondent indicated that her relationship with Fletcher had actually begun in August of 1998 and continued sporadically until August 15, 1999. Respondent also acknowledged, contrary to her August 17 statement, that she had spoken to Fletcher following his wife's death.

In September of 1999, the JTC received a request from Macomb County Prosecutor Carl Marlinga for an investigation into respondent's appointment of Fletcher during their

4

relationship. Following respondent's replies, the JTC filed Formal Complaint No. 65 on April 14, 2000. First, the complaint asserted that respondent had engaged in misconduct by appointing Fletcher to appear in cases before her without disclosing their relationship. Second, the complaint alleged that respondent made false statements to Hazel Park police officers in the August 17 interview concerning the murder of Fletcher's wife.

On April 26, 2000, this Court appointed former Justice Charles Levin to serve as master in this case. Meanwhile, respondent testified at the murder trial of Fletcher and indicated that she had made false statements during the initial police inquiry. The JTC then filed a petition for interim suspension pursuant to MCR 9.220.[2] On July 28, 2000, this Court entered an order suspending respondent with pay. *In re Chrzanowski*, 463 Mich 1201 (2000).

## II. MASTER'S FINDINGS

After conducting a formal hearing, the master issued his report on December 7, 2000. He found that respondent had appointed Fletcher as counsel for indigent criminal defendants in matters over which she presided, and had approved payment

---

[2]    MCR 9.220 provides that the JTC "may petition the Supreme Court for an order suspending a judge from acting as a judge until final adjudication of a complaint."

5

of legal fees to Fletcher during the period between April 1998 and August 1999, when she and Fletcher had been engaged in an intimate relationship. The master also found that Fletcher had received "a disproportionate number" of appointments in comparison with other attorneys who practiced before respondent. He concluded that respondent violated the Code of Judicial Conduct by making these appointments to Fletcher.[3] He stated that a judge is enjoined by this provision from allowing social or other relationships to influence conduct or judgment, and is further prohibited from making appointments on the basis of considerations other than merit.[4] The master also found that such appointments had "the appearance of impropriety" and "erode[d] public confidence in the judiciary."[5] Nonetheless, the master concluded that he could

---

[3] Canon 2(C) provides: "A judge should not allow family, social, or other relationships to influence judicial conduct or judgment."

[4] Canon 3(B)(4) provides: "All appointments shall be based upon merit."

[5] Canon 2(A) provides:

Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

not recommend discipline because the JTC "has not promulgated a policy respecting disproportionate assignments to close personal friends of the judge, and consequently the Supreme Court has not been called upon to enunciate a rule of law . . . justifying a recommendation for the imposition of discipline." Moreover, the master determined that, because respondent had a subjective good-faith belief that she could impartially hear cases in which Fletcher appeared, she was not required by the Code of Judicial Conduct, or by MCR 2.003[6] to

---

[6] MCR 2.003 provides:

    (A) Who May Raise. A party may raise the issue of a judge's disqualification by motion, *or* the judge may raise it.

    (B) Grounds. A judge *is* disqualified when the judge cannot impartially hear a case, including but not limited to instances in which:

    (1) The judge is personally biased or prejudiced for or against a party or attorney.

* * *

    (5) The judge knows that he or she . . . has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding.

    (D) Remittal of Disqualification. If it appears that there may be grounds for disqualification, the judge may ask the parties and their lawyers to consider, out of the presence of the judge, whether to waive disqualification. If, following disclosure of any basis for

disclose the relationship with Fletcher, or to raise on her own the matter of her disqualification. The master concluded that he was unable to recommend disciplinary action against respondent for this conduct.

Concerning allegations that respondent had made false statements to the police, the master determined that the statements were "inaccuracies." However, he concluded that "[t]he substance, if not the detail, of Chrzanowski's responses was accurate" and "[v]iewed as a whole, the information conveyed to the officers was accurate." The master found "as a matter of law" that, "unless a statement by a judge is a lie, i.e., 'a false statement made with deliberate intent to deceive,' there is not misconduct or conduct clearly prejudicial to the administration of justice within the meaning of Const 1963, art 6, § 30, justifying a recommendation of discipline." The master concluded that respondent "did not make statements to the police with deliberate intent to deceive, and did not lie to the police." On the basis of these findings, the master recommended

disqualification other than personal bias or prejudice concerning a party, the parties without participation by the judge, all agree that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceedings. The agreement shall be in writing or placed on the record.

dismissal of the charges concerning respondent's statements.

### III. Judicial Tenure Commission

The JTC adopted most of the findings of fact of the master, but not his conclusions of law.[7]  The JTC disagreed with the master's conclusion that respondent did not have a duty to disclose her relationship with Fletcher when she appointed him to represent indigent defendants, or where he appeared before her as retained counsel.  Further, the JTC disagreed with the master's conclusion that "as a matter of law," in order for the false statements to have constituted judicial misconduct, they had to be what the master characterized as "lies."

---

[7] All eight members of the JTC panel found misconduct on the part of respondent.  There was unanimity that respondent's assignments to Fletcher and his appearances before her while the two were engaged in a sexual relationship was improper, and constituted misconduct in office and conduct clearly prejudicial to the administration of justice.  A five-member majority recommended that respondent be suspended for one year without pay.  Commissioners James Kingsley and Henry Baskin agreed with most of the findings and recommendation of a one-year suspension, but dissented from the finding that respondent had made "false statements to the police." Commissioner Pamela Harwood wrote separately and agreed with the majority findings concerning the appointments without disclosure.  However, she also dissented from the finding that respondent had made false statements to the police. Commissioner Harwood recommended that respondent be suspended for forty-five to ninety days without pay, and that she be returned to active judicial service upon her reimbursement to the 37th District Court funding unit for ninety days of pay.

9

After setting forth the factors promulgated by this Court in *In re Brown*, 461 Mich 1291, 1292-1293 (1999) (*Brown I*), see also *In re Brown (After Remand)*, 464 Mich 135, 138; 626 NW2d 403 (2001) (*Brown II*), the JTC proceeded to find factors one through three, and five, relevant to respondent's conduct.[8] With regard to factor one, the JTC determined that

---

[8]  In *Brown I* and *II*, we stated that, in making judicial disciplinary recommendations, the JTC should consider:

(1) misconduct that is part of a pattern or practice  is more serious than an isolated instance of misconduct;

(2) misconduct on the bench is usually more serious than the same misconduct off the bench;

(3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;

(4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;

(5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;

(6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery . . . .  [*Brown I, supra* at 1292-1293; *Brown II, supra* at 138.]

10

respondent's fifty-six appointments to Fletcher over the course of seventeen months while the two were engaged in an intimate relationship, and her failure to disclose that fact, constituted a "pattern or practice" of misconduct.[9] With regard to factor two, the JTC observed that this misconduct constituted "misconduct on the bench." With regard to factor three, the JTC concluded that, although no evidence existed that respondent's conduct resulted in any actual prejudice to the administration of justice, such conduct did have a negative effect on the appearance of propriety in judicial decision making and the integrity of the judicial office in general.[10] With regard to factor five, the JTC concluded that respondent's misconduct was "deliberate" as opposed to "spontaneous," because she had considered whether the appointments to Fletcher were improper and had reached the

---

[9] Respondent argues that the fact that the proceedings over which she presided were "nonadversarial" in nature, i.e., that there was no prosecuting attorney present during Fletcher's representation of the indigent defendants, somehow lessened her duty to disclose her relationship with Fletcher. We disagree with this argument because, as the JTC noted, despite respondent's apparently fair disposition of these cases, her conduct did have a negative effect on the appearance of propriety in judicial decision making, and the appearance of integrity of the judicial office in general.

[10] The JTC acknowledged that respondent had fairly decided the issues before her in the cases in which she had appointed Fletcher.

subjective conclusion that they were not. In this regard, the JTC found that respondent's subjective conclusions about the propriety of presiding over these cases did "not negate the fact that the relationship existed and opposing counsel and others concerned with the integrity of the judiciary should have been so advised." With respect to factor five, the JTC also determined that respondent's "false statements" to the police appeared calculated to deflect any suspicion that she was the motive behind Leann Fletcher's murder. The JTC concluded that the fact that respondent corrected her erroneous statements "within a matter of days . . . [did] not diminish the gravity of her having made statements . . . on a material factor—the motive for the murder of Leann Fletcher."

In addition to these four factors, the JTC considered four additional factors.[11] First, the JTC concluded that

---

[11] As this Court noted in *Brown I*, *supra* at 1295, the JTC "should consider [the factors specified] and other appropriate standards that it may develop" when making recommendations. Here, the JTC additionally considered:

(1) The judge's conduct in response to the commission's inquiry and disciplinary proceedings. Specifically, whether the judge showed remorse and made an effort to change his or her conduct and whether the judge was candid and cooperated with the commission;

(2) The judge's discipline record and reputation;

12

respondent had reacted to the JTC investigation and the subsequent disciplinary proceedings candidly, cooperatively, and in good faith. Second, concerning the appointment procedures, the JTC found that respondent had instituted a "blind draw rotation system" subsequent to the investigation. According to the JTC, this demonstrated respondent's ability to improve her conduct. Further, concerning her statements to the police, the JTC found that, except for the first interview, respondent had fully cooperated with authorities in the prosecution of Fletcher. The JTC also determined that respondent had no prior disciplinary record, and that there was considerable evidence of her competency and good reputation in the community. Finally, the JTC found that respondent's relatively short judicial career constituted a mitigating circumstance, and that there was no reason to believe that she would repeat the misconduct. We now address

---

    (3) The effect the misconduct had upon the integrity of and respect for the judiciary;

    (4) Years of judicial experience. [*In re Chrzanowski*, Decision and Recommendation of the Judicial Tenure Commission, April 9, 2001, at 19-21, citing American Judicature Society, How Judicial Conduct Commissions Work (1999), pp 15-16.]

We find the application of each of these factors to be reasonable in the present context.

13

the issues raised by respondent in her petition to reject the JTC's recommendation.

### IV. STANDARD OF REVIEW

We review the recommendations of the JTC de novo. *In re Hathaway*, 464 Mich 672, 684; 630 NW2d 850 (2001); see also *In re Ferrara*, 458 Mich 350, 358-59; 582 NW2d 817 (1998). We also review the JTC's findings of fact de novo. *In re Jenkins*, 437 Mich 15, 18; 465 NW2d 317 (1991); see also *In re Somers*, 384 Mich 320, 323; 182 NW2d 341 (1971).

### V. ANALYSIS

Respondent first contends that the JTC's conclusion that her statements were false is contrary to the master's findings, and that the JTC should have deferred to such findings. Second, respondent argues that the JTC's lack of deference to the findings of the master was violative of her right to due process of law. Specifically, she contends that the JTC's combined function as an investigatory, as well as an adjudicatory body, created an actual risk of bias in the proceedings contrary to her entitlement to due process. Third, respondent contends that the JTC's recommended suspension of twelve months without pay is disproportionate. We will address these issues in turn.

#### A. THE JTC's DEFERENCE TO THE MASTER'S FINDINGS

14

We do not believe that the JTC disputed the factual findings of the master concerning respondent's statements to the police.[12]  Rather, the JTC and the master agreed that respondent had initially indicated that her relationship with Fletcher started in February 1999 and ended one month afterward, when in fact, as respondent later acknowledged, this relationship lasted from January 1998 to August 1999. Further, both the master and the JTC agreed that respondent had initially indicated that she did not speak with Fletcher on August 17, 1999, following his wife's death, when in fact, as respondent later acknowledged, she did speak with him.

Nonetheless, respondent questions the JTC's conclusions of fact concerning these statements. Specifically, respondent challenges the JTC's conclusions that the statements were false in light of the master's conclusion that, because the statements were taken from a "narrative" of the police interview, rather than from a direct transcript of respondent's statements, the "substance if not the detail" of respondent's statements "was accurate."[13] Respondent therefore

_____

[12]  As noted in the JTC's brief, "[The JTC] did not overrule any of the master's findings of fact.  The [JTC] did, however, accord different weight than the master did and, at times, drew different inferences and conclusions."

[13]  Concerning the length of respondent's relationship with Fletcher, the master stated that "[respondent]

15

contends that the JTC exceeded its authority in determining that the statements were false.

In response to this argument, the JTC asserts that it reviews the findings and conclusions of law of the master de novo, and that the JTC is not compelled to defer to the master's findings of fact. We agree. The JTC is established by the Michigan Constitution and vested with the responsibility of determining whether to recommend to this Court that a judge be disciplined for "misconduct in office . . . or conduct that is clearly prejudicial to the administration of justice." Const 1963, art 6, § 30. Section 30(2) further provides that on recommendation of the JTC,

> the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial

---

acknowledged, during the interview, when identifying papers seized at the Fletcher home, that her relationship with Fletcher stretched back to at least November, 1998." With respect to the contact with Fletcher, the master stated that "[respondent] provided the police with the substance of the communication from Fletcher" and "[i]t was of no importance whether Fletcher had spoken directly to her or by voice mail." Thus, according to the master, even though respondent did not speak truthfully, i.e., that the relationship had begun in 1998, and that she had in fact spoken to Fletcher, the information she provided implicitly acknowledged the length of the relationship and the "substance" of her conversation with Fletcher, and was therefore accurate.

16

> to the administration of justice. The supreme
> court shall make rules implementing this section
> and providing for confidentiality and privilege of
> proceedings.

Thus, pursuant to this provision, it is the JTC's, not the master's conclusions and recommendations that are ultimately subject to review by this Court. Additionally, § 30 provides that the Supreme Court shall make rules implementing the JTC's authority and procedures. Subchapter 9.200 of the Michigan Court Rules was promulgated for this purpose. As to the actual procedures in decision making, the court rules clearly indicate that the JTC has authority to review the master's findings de novo. MCR 9.221 governs the final decision of the JTC. In subsection (A) it provides in relevant part:

> The affirmative vote of 5 [JTC] members who have *considered the report* of the master and objections and who were present at an oral hearing provided for in MCR 9.217 . . . is required for a recommendation . . . . [Emphasis supplied.]

Accordingly, all that is needed for the JTC to make a valid recommendation is that it *consider* the report of the master and objections, and that a five-member majority agree on the facts and the recommended discipline. Further, subsection (B) of that court rule outlines procedures with regard to the JTC's recommendation itself:

> The commission *must* make written findings of
> fact and conclusions of law along with its

17

> recommendation for action with respect to the issues of fact and law in the proceedings, *but may adopt* the findings of the master, in whole or in part, by reference. [Emphasis added.]

Although this provision addresses creation of the record, its language provides further explication of the JTC's reviewing authority. The provision distinguishes between what the JTC *must* do, to wit, "make written findings of fact and conclusions of law", and what the JTC *may* do, to wit, "adopt the findings of the master . . ." Court rules, like statutes, are to be interpreted in accordance with their plain meaning. *Kelley v Mich Public Serv Comm*, 392 Mich 660, 668; 221 NW2d 299 (1974); see also *Neal v Oakwood Hosp Corp*, 226 Mich App 701, 722; 575 NW2d 68 (1997). Giving this court rule its plain meaning, we conclude that the JTC is not compelled to defer to the master's findings of fact, but rather may review the findings of fact, and the conclusions of the master, de novo.[14] In so concluding, we agree with the JTC that respondent's statements were "false" and "deliberately made,

---

[14] While we conclude that, where a master is appointed, the JTC may exercise de novo review of the record, it must, like all other reviewing tribunals apply the standard of proof applicable in civil proceedings: a preponderance of the evidence standard. MCR 9.211 ("the commission or the master shall proceed with a public hearing which must conform as nearly as possible to the rules of procedure and evidence governing the trial of a civil action"); see also *In re Seitz*, 441 Mich 590, 593; 495 NW2d 559 (1993).

18

and with a full understanding of their implication," and we disagree with the master that such statements were mere "inaccuracies", which did not rise to the level of judicial misconduct.

## B. RESPONDENT'S DUE PROCESS CLAIM

Respondent further claims that the JTC's "simultaneous" role as a prosecutorial, investigatory, and adjudicatory body is violative of her due process rights. In particular, Judge Chrzanowski asserts that the JTC's failure to defer to the factual findings of the master demonstrates that it could not separate itself from the fact-finding function, and therefore, that it could not, and did not impartially recommend discipline. We conclude that, while the JTC accepted the pertinent findings of fact of the master, it nonetheless based its recommendation upon a different characterization of the facts, to wit, that respondent's statements to the officers were false, rather than merely "inaccurate". On the basis of our review of the record, we do not disagree with this conclusion, and, for the reasons set forth below, we hold that the JTC afforded respondent due process.

It is uncontroverted that judges, like all other citizens, have protected due process interests under the Michigan Constitution, Const 1963, art 1 § 17, and the Due

19

Process Clause of the Fourteenth Amendment of the United States Constitution. The scope and meaning of due process protections in circumstances where there is some commingling of prosecutorial, investigatory, and adjudicatory roles has been discussed by the United States Supreme Court in a circumstance similar to the present case. In *Withrow v Larkin,* 421 US 35; 95 S Ct 1456; 43 L Ed 2d 712 (1975), the United States Supreme Court held that there is no broad prohibition against members of an administrative agency investigating facts, instituting proceedings, and then making the necessary adjudication. The *Withrow* case arose in Wisconsin where the Wisconsin Medical Examining Board commenced an investigation to determine whether a doctor had committed certain illegal acts. The board subsequently decided to hold a hearing to determine whether the doctor had committed the alleged acts and whether to suspend the doctor's license temporarily. *Id*. at 39-41. The Court held that the board could adjudicate the same charges it had investigated and decided to prosecute without violating the doctor's due process rights. *Id*. at 47-55. The Court stated:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must

20

overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented. [*Id.* at 47; see also *McIntyre v Santa Barbara Co Emp Ret System*, 91 Cal App 4th 730; 110 Cal Rptr 2d 565, 569 (2001) (the combination of investigative and adjudicative functions does not, *without more*, constitute a due process violation); *Marshall v Cuomo*, 192 F3d 473, 484-485 (CA 4,1999) (due process rights are not violated *simply* by the combination of the investigatory, prosecutorial, and adjudicatory functions in one agency, but rather by actual bias or the high probability of bias); *Matter of Inquiry Concerning a Judge*, 265 GA 843; 462 SE2d 728 (1995) (the combination of investigative and adjudicative functions does not, per se, violate the requirements of due process).

Notably, the Court further observed that, while the combination of investigative and adjudicative functions is not, without more, a due process violation, this "does not, of course, preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intolerably high." *Withrow, supra* at 58. However, the Court found no such special facts and circumstances with regard to the professional discipline board in *Withrow.*

This Court also has had occasion to address this due process issue especially in reference to the JTC and has

adopted the *Withrow* standards.[15]  In *In re Del Rio*, 400 Mich 665, 690; 256 NW2d 727 (1977)*,* we noted that "the authority is legion in support of the proposition that combining the investigative and adjudicative roles in a single agency does not necessarily violate due process in administrative adjudications such as judicial fitness hearings."  *Id.*, see also *In re Moore,* 464 Mich 98, 128-131; 626 NW2d 374 (2001). Further, we held in *In re Mikesell,* 396 Mich 517, 530; 243 NW2d 86 (1976), that "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation . . . ." Quoting from *Withrow*, *supra* at 58.  Thus, in accordance with *Withrow,* this Court held that a court should examine the matter to see if there are "special facts and circumstances present in the case before it" that present an "intolerably high" risk of unfairness.  *Id.*

---

[15]  In *Brown I*, we noted that the JTC's application of the listed factors to judicial misconduct proceedings, by "ensur[ing] a consistent rule of law," would assist in maintaining due process rights for JTC respondents. *Brown I*, *supra* at 1295.  We recognized that "[d]ue process of law is essentially the legal equivalent of procedural fairness . . . [and] a concept that 'calls for such procedural protections as the particular situation demands.'"  *Id.*, citing *Mathews v Eldridge*, 424 US 319, 333-334; 96 S Ct 893; 47 L Ed 2d 18 (1976), and *In re Brock*, 442 Mich 101, 110-111; 499 NW2d 752 (1993).  As we have indicated in this opinion, the JTC appropriately analyzed respondent's conduct in light of the *Brown* factors, and in doing so, afforded respondent adequate due process protection.

We find, in reliance upon *Withrow* and the Michigan authorities, that the procedures followed by the JTC in reaching its decision conformed to the constitution and the court rules, and afforded respondent sufficient due process protections. We further conclude that there were no special facts or circumstances which would suggest that the risk of unfairness here, if indeed there was any, was "intolerably high." *Mikesell*, *supra* at 531. As to the procedures, first, pursuant to MCR 9.207(B)(3), the JTC conducted a preliminary investigation to determine whether respondent's alleged conduct warranted further action. Second, after determining that sufficient evidence of misconduct existed, the JTC filed a formal complaint pursuant to MCR 9.208. Third, a master was appointed,[16] notice was given, and a hearing was then afforded respondent under MCR 9.210(A) and MCR 9.211, with the JTC's executive director serving as prosecutor-examiner under MCR 9.201(6). Fourth, after the hearing, when objections were lodged against the master's findings, the examiner under MCR 9.216 issued such objections in writing, with a supporting brief. MCR 9.216. Finally, the JTC's conclusion that Judge Chrzanowski should be disciplined was ultimately just a

---

[16] Although it is not required that a master preside at a disciplinary hearing, the JTC under MCR 9.210 may request this Court to appoint a master, as it did in this case.

23

recommendation to this Court that we are charged to review de novo pursuant to deciding what discipline, if any, is appropriate. As in *Withrow*, the JTC's investigative and adjudicative procedures are functionally separate; additionally, as distinct from *Withrow*, in which the investigation and the decision were undertaken by the same Medical Examining Board, here the master, the examiner, and the JTC panel are separate entities. If the board in *Withrow* did not violate due process rights by investigating, and then adjudicating claims, it can hardly be argued that the JTC's procedures violated due process. Further, a majority of the members of the JTC are judges, and all the members who ultimately recommend discipline are assumed to be fair and impartial. We conclude then that there was no actual bias in the JTC's decision. It had authority to review the master's findings de novo, and reasonably determined, by a preponderance of the evidence, that respondent had in fact made false statements. We find these procedures adequately separated the JTC's investigative and adjudicative functions.[17]

C. THE PROPORTIONALITY OF THE JTC'S RECOMMENDATION

---

[17] There were three levels of review in the instant case: (1) the master's findings and conclusions issued after the public hearing, (2) the JTC's de novo findings and recommendations, and (3) this Court's de novo review.

24

The JTC has recommended that respondent be suspended for one year without pay. Respondent argues that, in light of previous JTC recommendations, this sanction is disproportionate. Respondent cites several opinions written before *Brown I* and *Brown II* in which various sanctions were meted out for incidents of judicial misconduct. However, as *Brown I* indicated, review by this Court of previous judicial disciplinary proceedings has sometimes been "hampered because the standards by which the JTC [produced] its recommendations [were not always] apparent." *Brown I, supra* at 1292. Rather than analyze each of the cases raised by respondent in her argument challenging the proportionality of the recommended sanction, we have chosen instead to examine the proportionality of her sanction in light of the JTC's application of the *Brown* factors. Here, as outlined in part III, the JTC set forth its analysis in the context of these factors. We find this analysis to be reasonably done and therefore accord the recommendations of the JTC considerable deference.[18]

---

[18] Respondent argues that the inordinate amount of publicity surrounding her case influenced the JTC to recommend a harsher sanction than deserved. We disagree. As noted in this opinion, Canon 2(A) provides that "[a] judge must avoid all impropriety and appearance of impropriety," and "[a] judge must expect to be the subject of constant public scrutiny."

This Court assesses the proportionality of the JTC's recommendations of discipline, with the goal of "maintain[ing] the honor and the integrity of the judiciary, deter[ring] similar conduct, and further[ing] the administration of justice." *In re Hocking*, 451 Mich 1, 24; 546 NW2d 234 (1996). "[T]he purpose of judicial discipline is not to punish but to maintain the integrity of the judicial process." *In re Moore*, *supra* at 118. We conclude that the JTC's recommendation of a one-year suspension of respondent without pay was a clearly reasonable one.

However, the JTC could not have known, and thus did not consider, the overall length of respondent's interim suspension, which has continued until the issuance of this opinion. We believe that some consideration should be given to the chastening effect of respondent's seventeen-month interim suspension from judicial duties, although such suspension has been with pay. In a democratically elected

---

These provisions embody the concept that judges are particularly susceptible to public scrutiny, and that they must take appropriate account of the effects of their conduct upon the public's perception of the courts and the justice system. While we do not agree that the JTC's recommendation here was unduly influenced by the media's focus, we nevertheless observe that caution must invariably be exercised by the JTC (as well as by this Court) to ensure that the attentions of the media upon particular judicial misconduct are placed in an appropriate perspective.

26

judicial system, such as we have in Michigan, suspension of a judge from judicial activities is itself a sanction with considerable consequences, and we believe that respondent has incurred many of those consequences. We conclude that in this unique case it is reasonable to accord respondent credit for six months of her seventeen-month interim suspension. Accordingly, pursuant to MCR 9.225,[19] we modify the recommendation of the JTC only to accord respondent credit for six months of the seventeen-month interim suspension that she has already served.[20] Therefore, we direct the following disciplinary action in this case:

> This cause having been brought to this Court by the recommendation of the Judicial Tenure Commission and having been briefed and argued by counsel, it is ordered that Respondent Hon. Susan

---

[19] MCR 9.225 provides:

> The Supreme Court shall review the record of the proceedings and shall file a written opinion and judgment which may direct censure, removal, retirement, suspension, or other disciplinary action, or reject or *modify* the recommendations of the commission. [emphasis added.]

See also *In re Hathaway*, 464 Mich 672, 685; 630 NW2d 850 (2001).

[20] We concur with the JTC that respondent should not be permanently removed from the bench. We believe that evidence of respondent's reputation and her past conduct on the court, apart from that at issue in the present case, suggest that she possesses the ability to serve honorably upon the bench, and to fully live up the Code of Judicial Conduct.

27

> R. Chrzanowski shall be suspended from the
> discharge of all judicial and administrative
> duties, without pay, for a period of twelve months.
> However, respondent shall receive credit for six
> months served during the period of her interim
> suspension. Respondent shall serve the remainder
> of her twelve-month suspension, six months without
> pay, to begin January 1, 2002. After June 30,
> 2002, respondent may return to the bench of the 37th
> District Court to serve the remainder of her term.

Respondent's conduct on the bench was unbecoming of the office that she holds. Her actions undermined public confidence in the integrity and impartiality of the judiciary, and were prejudicial to the administration of justice. Const 1963, art 6, § 30. "As the cornerstone of our tripartite system of government, the judiciary has a public trust to both uphold and represent the rule of law." *Hocking*, *supra* at 6. "[J]udges . . . are bound to conduct themselves with honor and dignity." *Id.*

We conclude, as did the JTC, that respondent's conduct was violative of the standards established by the constitution, the Michigan Court Rules, and the Code of Judicial Conduct. We emphasize, moreover, that respondent is being disciplined only for her improper appointments of counsel, her failure to disclose those appointments, and for her false statements to the interviewing officers.

## VII. Conclusion

We conclude that the JTC reasonably determined that respondent's actions in the foregoing case constituted

28

judicial misconduct sufficient to subject her to the sanctions set forth in this opinion.  Pursuant to MCR 7.317(C)(3), the Clerk is directed to issue the judgment order forthwith.

CORRIGAN, C.J., and CAVANAGH, WEAVER, KELLY, TAYLOR, and YOUNG, JJ., concurred with MARKMAN, J.