No. 14-0379 - In the Matter of: Jaymie Godwin Wilfong, Judge, 20th Judicial Circuit

**FILED**

**October 30, 2014**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

LOUGHRY, Justice, concurring, in part, and dissenting, in part:

While I concur with the fully-justified suspension of Judge Wilfong for the remainder of her term in office, I staunchly disagree with the majority's unsubstantiated refusal to impose the recommended $20,000.00 fine against her. If this Court will not deliver justice to the citizens whose county has been compromised by the malfeasance of their highest ranking judicial officer, who will? Not only was Judge Wilfong the county's highest judicial officer, but she served for more than two years on the Judicial Hearing Board, passing judgment on fellow members of the judiciary while engaged in the very conduct that led to the disciplinary stripping of her judicial robe. "[I]t is, 'emphatically, the province and duty of the judicial department, to say what the law is.' But then the question arises 'Who shall keep the keepers?' Who shall be responsible for putting the judiciary's house in order?" *Matter of Del Rio*, 256 N.W.2d 727, 753 (Mich. 1977) (citations omitted). The majority, or so it appears, is more concerned with minimizing sanctions to a single public official than ensuring that the entirety of the Randolph County judiciary is in order.

1

I wish to be clear that this case is not about an extra-marital affair and its moral implications. Instead, this disciplinary matter arose as a result of Judge Wilfong's utter failure to uphold the integrity of her judicial office and to avoid the appearance of impropriety and bias–both real and perceived. "Because public confidence in judges is essential to maintaining the legal system, 'misconduct by a judge brings the office into disrepute and thereby prejudices the administration of justice.'" *In re Williams,* 777 A.2d 323, 330 (N.J. 2001) (quoting *In re Winton*, 350 N.W.2d 337, 340 (Minn.1984)). Judge Wilfong chose to participate in an extra-marital affair that was tied not only by time and space to her judicial chambers, but permeated the very fabric of her judicial duties. "The Canons of Judicial Conduct are standards measuring fitness for judicial office and therefore embrace tests of behavior relating to integrity and propriety that condemn actions in which the average citizen can freely indulge without consequence." *In re Douglas*, 382 A.2d 215, 219 (Vt. 1977). Despite her counsel's protestation that she was "seduced and taken advantage of," the record makes patently obvious that Judge Wilfong used her position and power to engage in, facilitate, and, more importantly, conceal an extra-marital affair that unquestionably compromised her impartiality.

Judge Wilfong engaged in an extra-marital affair lasting more than two years with an individual ("Mr. Carter") who personally, and through his subordinates, regularly appeared before her in connection with the sentencing of criminal defendants to the program

2

he oversaw. During the period of their affair, Mr. Carter and/or his subordinates participated in *forty-six* separate criminal cases in front of Judge Wilfong. Moreover, she used her position as an intermediary with the county commission to obtain a vehicle for Mr. Carter, to influence his spending authority, and to maintain his job security, advising the county commission that she would not utilize the program unless Mr. Carter was the Executive Director.

Not only did her actions demonstrate a bold disregard for the Code of Judicial Conduct, but they equally evidence a wholesale lack of respect for her colleagues and fellow officers of the court in Randolph County. To facilitate and conceal this affair, she confided in her own subordinates and fellow members of the bar about the affair and, whether expressly or impliedly, used the considerable power of her office to fuel the liaison. While Judge Wilfong told fellow members of the judiciary and the bar that she was both aware of and concerned about the ethical implications of her conduct, she failed to disclose the relationship to litigants appearing before her. And, to those in whom she had confided, she repeatedly misrepresented that the relationship had ended.

Judge Wilfong used her position to leverage an assistant prosecutor and a fellow attorney to secure the use of their residences to further the affair. These same

3

attorneys understandably expressed concern about appearing in front of her after being

compelled to file complaints and testify against her in the instant proceedings.

> A judicial office represents a public trust, and the conduct of a
> judicial officer may bear upon the independence and integrity of
> the judiciary regardless of whether the conduct implicates the
> decision-making process. One aspiring to, or holding, the office
> cannot reasonably expect to be a rogue in his or her private life
> without thereby staining the integrity of the position.

*In re Carney*, 79 A.3d 490, 506 (Pa. 2013).

In fact, one of Judge Wilfong's closest friends, Christopher Cooper, the

chairman of her family court election committee, was forced to file a complaint against her

in compliance with his reporting obligations and in fulfillment of his duty to his clients who

were affected by Judge Wilfong's actions.[1] Mr. Cooper testified before the Judicial Hearing

Board that "a lot of people are hurt by this" and it "has had a negative impact on the legal

community[.]" Explaining further, Mr. Cooper noted that the "relentless" press coverage

about Judge Wilfong's conduct has caused "a lot of trust" to be lost in the community at large

since "the community looks to us to be above board, and if we aren't and if we appear to be

then we suffer and the public doesn't want to trust us to hear cases." With regard to his own

---

[1]In addition to her October 14, 2013, self-reporting, Judge Wilfong's conduct was reported to the Judicial Investigation Commission by her law clerk, Mary Catherine Wendekier; Randolph County Prosecuting Attorney Michael Parker; attorney Christopher Cooper; and Community Corrections board members R. Mike Mullens, Heather Weese, Raymond LaMora, and David Wilmoth.

clientele, Mr. Cooper explained that he perceived that Judge Wilfong's required disclosure of the fact that he filed a judicial complaint against her at the outset of each hearing and in front of his clients has caused them to lack confidence in him and view him as "the judicial rat."

Rather than demonstrating her sincere remorse for placing her friends, colleagues, and fellow members of the bar in this compromising position, Judge Wilfong begs for a mere reprimand and offensively suggests that the litany of complaints from the Randolph County bar were manufactured simply out of fear for the lawyers' own reporting obligations, rather than reflecting a genuine belief that the integrity of the judiciary had truly been jeopardized. "Integrity in all actions done in a judicial decision-making capacity is of course vital. But integrity and high standards of conduct also relate to the much broader issue of faithfully adhering to the public trust which resides with every judge and justice in all other public conduct." *Matter of Neely*, 178 W. Va. 722, 729, 364 S.E.2d 250, 257 (1987) (Workman, J., concurring and dissenting).

It is clear that Judge Wilfong cavalierly betrayed the trust of the voters and citizens of Randolph County. Equally clear is the fact that her conduct will cost the *entirety* of the state's taxpayers considerable expense to address this betrayal of the public's trust. The undisputed testimony in this case demonstrates that the investigation into Judge

5

Wilfong's actions cost Randolph County approximately $50,000.00.[2] Because of her actions and resultant suspension, this Court has been forced to assign and pay temporary judges to cover the remainder of Judge Wilfong's term at considerable expense to the taxpayers.[3] The Judicial Hearing Board recommended a fine of $20,000.00–less than half of the total permissible fine of $55,000.00. Nevertheless, the majority summarily rejects the considerably-discounted fine recommended by the Judicial Hearing Board, thereby adding insult to injury. Sadly, the citizens of this state have recently seen first-hand the effect of malfeasance and/or corruption in the judiciary and the exponentially devastating effect such behavior has in rural counties with only one sitting circuit judge. Through this case, the majority has allowed inappropriate judicial conduct to have not only deleterious effects on the public's perception of the judiciary, but also a grievous effect on the state's coffers as well.

While seemingly acknowledging the severity of Judge Wilfong's behavior by imposing a suspension until the end of her term, the majority utterly disrespects the

[2]Separate from the significant amount of money spent on the investigation, innumerable employee hours and county and state resources were devoted to investigating this matter.

[3]In addition to the temporary judges that will now be appointed to cover Judge Wilfong's caseload until the end of her term due to her suspension, this Court previously assigned three senior status judges beginning in May of 2014, to cover a significant amount of Judge Wilfong's caseload due to myriad motions seeking her disqualification. It is common for these temporary judges to require hotel accommodations. They also receive mileage and meal expenses as well as a per diem in the amount of $435.00 per day.

considerable wisdom and experience of the Judicial Hearing Board through its wholesale rejection of the recommended $20,000.00 fine. The Judicial Hearing Board is comprised of nine members, consisting of three circuit judges, one senior status circuit judge, one magistrate, one family court judge, and three members of the public. These nine people–imbued with the grave responsibility and authority of keeping a watchful eye on our highest officials–absorbed and observed first-hand the distasteful details of Judge Wilfong's misconduct and, critically, the effect that conduct had upon the citizens and bar of Randolph County. Wholly dismissive of the weighty consideration of the evidence presented to the Judicial Hearing Board, the majority flatly rejects the $20,000.00 fine. While the majority justifies its actions as merciful, it should not be overlooked that substantial mercy was already afforded by the Judicial Hearing Board, which could have imposed an eleven-year suspension and a $55,000.00 fine for Judge Wilfong's *eleven* violations of the Code of Judicial Conduct.[4] In what can only be viewed as a fit of selective amnesia, the majority forgets that this Court did not hesitate to accept the Judicial Hearing Board's recommended sanction of a $20,000.00 fine against Magistrate William Tom Toler for his *four* separate violations of the Code of Judicial Conduct. *See In re Toler*, 218, W.Va. 653, 625 S.E.2d 731

---

[4]The sole legal justification provided by the majority for the complete removal of the fine imposed by the Judicial Hearing Board was its citation to two dissenting opinions included in a footnote.

(2005). Unlike the case *sub judice*, the fine in *Toler* was the maximum fine that could have been imposed. Apparently the majority's mercy is as selective as its memory.[5]

Equally persuasive is the manner in which other courts have handled similar behavior. These cases evidence a uniform recognition that misconduct of a sexual nature that encroaches upon judicial duties is treated as a serious offense–one that deserves the combined sanctions of office-stripping and fine imposition when the egregiousness of the conduct so merits as it clearly does in this case.[6]

---

[5]Although the majority's rejection of the fine in this matter is difficult to accept from a sanctions perspective, it is even more troubling when considering the ever-mounting expense that Judge Wilfong's behavior will cost the taxpayers of this state. *See supra* note 3.

[6]*Matter of Edwards*, 694 N.E.2d 701 (Ind. 1998) (removing judge from office, disbarred, permanently enjoining judge from ever seeking judicial office again, and fined $100,000 for sexual relationship with litigant); *In re McCree*, 845 N.W.2d 458 (Mich. 2014) (imposing six-year suspension without pay for affair with litigant); *see also In re Abrams*, 257 P.3d 167 (Ariz. 2011) (upholding two-year suspension of judge's law license after resignation due to affair with defense attorney and permanently enjoining him from again serving as a judicial officer in Arizona); *In re Miller*, 949 So.2d 379, 394 (La. 2007) (removing judge from office due to adulterous relationship with secretary which "brought the judicial office into disrepute"); *Matter of Gelfand*, 512 N.E.2d 533 (N.Y. 1987) (removing judge from office due to extramarital affair with legal assistant); *In re Kivett*, 309 S.E.2d 442 (N.C. 1983) (removing judge from office due to improper relationship with bail bondsman and disqualifying from future judicial office); *In re Chrzanowski*, 636 N.W.2d 758, 771 (Mich. 2001) (affirming one-year suspension of judge without pay for appointment of attorney with whom she was having affair because "actions undermined public confidence in the integrity and impartiality of the judiciary").

The citizens of West Virginia, and particularly Randolph County, deserve better than the watered-down disposition settled upon by the majority.[7] "In disciplining a judicial officer for his misconduct, [such discipline] not only punishes the wrongdoer, but also repairs the damaged public trust and provides guidance to other members of the judiciary regarding their conduct." *In re Melograne*, 812 A.2d 1164, 1168 (Pa. 2002). The majority has not only failed the public, but through its unwillingness to mete out an appropriately stiff sanction it has also dishonored the faithful and reputable service administered each day by the remaining members of the West Virginia judiciary. Accordingly, while I concur in the suspension of Judge Wilfong through the end of her term in office, I respectfully dissent from the majority's refusal to impose the fine recommended by the Judicial Hearing Board.

---

[7]This Court's discussion in *Young v. Saldanha*, 189 W.Va. 330, 431 S.E.2d 669 (1993), regarding the vital need for self-policing within the medical community is analogous to the equally-important need for the judiciary to be subject to the same type of rigorous, internal review. *See id.* at 334-335, 431 S.E.2d at 673-674. The willingness of the majority to reject the significant fine agreed upon by the Judicial Hearing Board vitiates the efforts of the very system we have adopted to "police" the robe-wearers of our judicial system.