SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**In the Matter of John F. Russo, Jr. (D-100-18) (082636)**

**Argued April 30, 2020 -- Decided May 26, 2020**

**RABNER, C.J., writing for the Court.**

This disciplinary matter involves repeated and serious acts of misconduct by a Judge of the Superior Court, Respondent John F. Russo, Jr. A complaint issued by the Advisory Committee on Judicial Conduct (ACJC) alleged four counts of misconduct.

Before the ACJC, Respondent stipulated to the allegations in Counts III and IV. As was his right, he contested the first two counts before the ACJC. The ACJC found clear and convincing evidence that Respondent violated the Code of Judicial Conduct as to all four matters. Respondent accepted the ACJC's findings for purposes of a hearing before the Court to determine what discipline should be imposed. After the hearing on July 9, 2019, the Court concluded, because of the seriousness of the ethical violations, that it was appropriate to consider the full range of potential discipline. The Court therefore initiated formal removal proceedings and designated a three-judge panel to conduct a hearing, take evidence, and report their findings. The panel unanimously concluded beyond a reasonable doubt that Respondent violated the Code in all four matters and should be removed from office.

**HELD:** Based on its review of the extensive record, the Court finds beyond a reasonable doubt that there is cause for removal. Because of Respondent's multiple, serious acts of misconduct -- in particular, his inappropriate behavior in a matter involving an alleged victim of domestic violence -- the Court orders his removal from office.

1. Count I involves Respondent's conduct during and after a hearing for a final restraining order. The plaintiff, an unrepresented litigant, alleged that the defendant threatened her life, sexually assaulted her, and made inappropriate comments to their five-year-old daughter. On the first day of the hearing, the plaintiff testified that defendant "force[d] himself on [her] to have sex with him." She described that alleged attack as well as other events of alleged domestic violence. During cross-examination, defense counsel at one point asked the plaintiff if she had ever worked as an exotic dancer, which she admitted. Soon after, Respondent took over the questioning and asked the plaintiff at length about her efforts to stop the alleged assault, including whether she had tried to "[b]lock [her] body parts," "[c]lose [her] legs," "[c]all the police," or "leave."

1

No witness, alleged victim, or litigant should be treated that way in a court of law. As the ACJC found, the questions were "wholly unwarranted, discourteous and inappropriate." The questions also shamed the alleged victim by intolerably suggesting she was to blame. Respondent claimed he was trying to help a "demoralized" witness on cross-examination and "get her re-engaged in the hearing." That explanation does not square with the record. Beyond that, Respondent's coarse questions about how the plaintiff responded during the alleged assault were not relevant. Sexual assault turns on the alleged aggressor's use of physical force, not the victim's state of mind or resistance.

Respondent's comments to his court staff and law clerk after the hearing ended are just as problematic. He asked if they had "hear[d] the sex stuff" and said, "You think it's all fun and games out here." Respondent also said, "I am the master of on the record being able to talk about sex acts with a straight face."

Judges set the tone for a courtroom. Especially when it comes to sensitive matters like domestic violence and sexual assault, that tone must be dignified, solemn, and respectful, not demeaning or sophomoric. Respondent failed in that regard. Respondent said his remarks about "fun and games" were part of an effort to give guidance to his law clerk about the complexity of domestic violence cases. But the exchange that Respondent initiated was not an instructive lesson of any sort.

Count I alleges that Respondent violated Canon 1, Rule 1.1; Canon 2, Rule 2.1; and Canon 3, Rule 3.5 of the Code. The evidence demonstrates beyond a reasonable doubt that Respondent violated all three cardinal principles. (pp. 5-13)

2. Count II relates to a personal guardianship matter involving Respondent, his ex-wife, and their son. It asserts that Respondent asked the Family Division Manager in the Ocean Vicinage (the Manager) to contact her counterpart in another vicinage and request that the hearing in the upcoming guardianship trial be rescheduled to accommodate Respondent. Respondent and the Manager provided different accounts in their testimony. The Court explains how the documentary evidence, phone records, and circumstances of the guardianship matter support the Manager's testimony. The Court agrees with the ACJC's and the panel's findings that the Manager's account was more credible. Like any other litigant, Respondent should have worked through his attorney to request that his personal matter be rescheduled, not a high-level court employee who worked in the same courthouse where he served as a judge. Count II alleges that Respondent violated Canon 1, Rule 1.1, and Canon 2, Rules 2.1 and 2.3(A) of the Code. The evidence demonstrates beyond a reasonable doubt that Respondent violated those precepts. (pp. 14-17)

3. Respondent stipulated that his conduct in Count III violated the Code. The matter relates to a hearing Respondent presided over in which the defendant, whom Respondent announced in court he had known since high school, had been arrested for failure to pay a

2

child support arrearage.  Respondent reduced the defendant's purge amount from $10,000 to $300 based solely on uncorroborated financial information supplied by the defendant, raising doubts about Respondent's impartiality.  Count III asserts Respondent violated Canon 1, Rule 1.1, and Canon 2, Rule 2.1, and Canon 3, Rule 3.17(B) of the Code, as well as New Jersey Court Rule 1:12-1(g).  The uncontested evidence demonstrates beyond a reasonable doubt that he did.  (pp. 18-19)

4.  Respondent also stipulated that his behavior outlined in Count IV violated the Code.  During a nine-minute ex parte phone conversation in front of a crowded courtroom, Respondent threatened the defendant mother in a paternity case with financial penalties and a loss of credibility with the court when she said she was scared to disclose her address.  He also said, "he's going to find you, ma'am.  We're all going to find you."  As the panel correctly observed, Respondent's disturbing comments and questions were insensitive, threatening, and discourteous, and they reflected poorly on his temperament.  Count IV alleges Respondent violated Canon 3, Rule 3.8 of the Code.  Once again, the undisputed evidence demonstrates beyond a reasonable doubt that he did.  (pp. 19-20)

5.  The system of judicial discipline is not designed to punish judges.  Its overriding purpose is to preserve public confidence in the integrity and the independence of the Judiciary.  (pp. 21-22)

6.  Viewed together, Respondent's multiple acts of misconduct have lasting consequences.  His pattern of misconduct and unethical behavior not only undermined the integrity of different court proceedings but also impaired his integrity and the Judiciary's.  His overall behavior reflects a lack of probity and fitness to serve as a judge.  And his conduct breached the public's trust.  The vast majority of the more than 400 judges who serve on the Superior Court abide by the highest of ethical standards.  In carrying out their responsibilities, they must uphold the law.  Occasionally, judges are required to make difficult decisions that may be unpopular.  They have no reason to fear that discipline will be imposed in such instances.  Judicial independence, which is central to a constitutional democracy, rests on those core values.  Judges may also make mistakes while reasonably carrying out their duties in good faith.  That is not a basis for discipline either.  Potential legal errors are properly challenged and reviewed on appeal instead.  The series of ethical failures that Respondent committed are not errors of law, innocent missteps, or isolated words taken out of context.  Viewed as a whole, they are flagrant and serious acts of misconduct.  Respondent's explanations under oath about what occurred also reveal a lack of candor on multiple occasions, which factors into the Court's judgment in this matter.  (pp. 22-25)

**The Court directs that Respondent be removed from office.**

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON and TIMPONE join in CHIEF JUSTICE RABNER's opinion.**

3

SUPREME COURT OF NEW JERSEY
D-100 September Term 2018
082636

In the Matter of

John F. Russo, Jr.,

a Judge of the Superior Court

of the State of New Jersey

On a Complaint for Removal from Judicial Office
Pursuant to Rule 2:14 and N.J.S.A. 2B:2A-1 to -11,
and an Order to Show Cause Why Respondent
Should Not be Removed from Office
or Otherwise Disciplined

| Argued | Decided |
| --- | --- |
| April 30, 2020 | May 26, 2020 |

David W. Burns, Deputy Attorney General, argued the cause on behalf of the Office of the Attorney General (Gurbir S. Grewal, Attorney General, attorney). David W. Burns on the briefs.

Respondent, through counsel, submitted a letter waiving appearance at oral argument and relying on the record. (The Corrigan Law Firm and Reisman, Carolla, Gran, Zuba, attorneys). David F. Corrigan and Amelia Carolla on the briefs.

CHIEF JUSTICE RABNER delivered the opinion of the Court.

1

This disciplinary matter involves repeated and serious acts of misconduct by a Judge of the Superior Court, Respondent John F. Russo, Jr. A complaint issued by the Advisory Committee on Judicial Conduct (ACJC) alleged four counts of misconduct. After it conducted a hearing, the ACJC found clear and convincing evidence to support all the charges. A panel of three Judges designated by the Court then conducted a separate, additional hearing and concluded that the evidence supported a finding beyond a reasonable doubt that Respondent violated the Canons of the Code of Judicial Conduct and the Rules cited in all four counts. The panel recommended that Respondent be removed from office.

Based on our review of the extensive record, we find beyond a reasonable doubt that there is cause for Respondent's removal. See N.J.S.A. 2B:2A-9. Because of Respondent's multiple, serious acts of misconduct -- in particular, his inappropriate behavior in a matter involving an alleged victim of domestic violence -- we order his removal from office.

I.

In recounting the facts and history of this matter, we draw liberally from the ACJC's 45-page Presentment filed on March 13, 2019, and the panel's 69-page ruling filed on January 28, 2020. Both documents are comprehensive and thorough.

The charges and findings relate to four discrete instances of misconduct. Count I, the most serious matter, concerns Respondent's conduct at a hearing on an application for a final restraining order. The misconduct charged relates to his questioning of an alleged victim of domestic violence who testified that she had been sexually assaulted, as well as his comments to staff members in open court after the hearing. Count II addresses a personal guardianship matter in which Respondent allegedly asked a Judiciary employee to contact her counterpart in another vicinage and request that a hearing be rescheduled to accommodate Respondent. Count III asserts Respondent created the appearance of a conflict of interest when he presided over a matter in the Family Division in which he knew both parties since high school. Count IV relates to Respondent's ex parte communication with an unrepresented litigant.

Before the ACJC, Respondent stipulated to the allegations in Counts III and IV. As was his right, he contested the first two counts before the ACJC. The ACJC found clear and convincing evidence that Respondent violated the Code of Judicial Conduct as to all four matters. A majority of the ACJC recommended that Respondent be suspended without pay for three months; four members recommended a six-month suspension.

Respondent accepted the ACJC's findings for purposes of a hearing before this Court to determine what discipline should be imposed. After the

3

hearing on July 9, 2019, the Court concluded, because of the seriousness of the ethical violations, that it was appropriate to consider the full range of potential discipline up to and including removal from office. The Court therefore initiated formal removal proceedings, consistent with N.J.S.A. 2B:2A-1 to -11 and Rule 2:14, and directed the Clerk of the Court to file a complaint for removal and issue an order to show cause why Respondent should not be removed from office. See N.J.S.A. 2B:2A-3; R. 2:14-1, -2.

Pursuant to N.J.S.A. 2B:2A-7, the Court also designated the Honorable Carmen Messano, P.J.A.D. and Presiding Judge for Administration of the Appellate Division, and the Honorable Julio L. Mendez and Bonnie J. Mizdol, Assignment Judges of the Superior Court, to conduct a hearing, take evidence, and report their findings.

The panel heard testimony from Respondent and the Family Division Manager in the Ocean Vicinage, received documentary evidence, and reviewed audio files of three court proceedings. Following the hearing, the panel unanimously concluded beyond a reasonable doubt that Respondent violated the Code in all four matters and should be removed from office.

We scheduled and held oral argument before the Court on April 30, 2020. We declined Respondent's request to postpone argument until in-person

4

proceedings could resume after the COVID-19 pandemic.[1]  Through counsel,

Respondent notified the Court that he would rely on the record and that neither

he nor his counsel would appear for the hearing scheduled for April 30, 2020.

II.

We address the four counts of the complaint in turn.  As to each, the

presenter must demonstrate proof beyond a reasonable doubt, the heightened

standard that applies in removal proceedings.  See N.J.S.A. 2B:2A-9.  We

devote more attention to Count I because it raises the most significant

concerns.

A.

Count I involves Respondent's conduct during and after a hearing for a

final restraining order (FRO) in the matter of M.R. v. D.H.

On March 28, 2016, an unrepresented litigant, the plaintiff, obtained a

temporary restraining order (TRO) against the father of her five-year-old

daughter.  She alleged that the defendant threatened her life, sexually assaulted

---

[1]  On March 26, 2020, the Court granted Respondent's first request for an adjournment and rescheduled the matter for the end of April.  As the new date approached, Respondent requested an additional adjournment until such time as he could appear in person before the Court.  By late April, when the request was denied, the Judiciary had transitioned to virtual court proceedings in all areas and had successfully completed more than 12,000 remote court events with 80,000 participants.

her, and made inappropriate comments to their child. The hearing on an application for an FRO took place over several days in May and June 2016.

On the first day of the hearing, the plaintiff testified that on March 24, 2016, the defendant "force[d] himself on [her] to have sex with him." She described how he grabbed at her clothes and pulled her pants down. Although she told him to stop and get off of her, the two "had sex, but it was against [her] will." The panel noted that

> the plaintiff then described other events of alleged domestic violence, including the defendant disabling her garage door, breaking her vehicle's windshield, threatening to call child protective services to have her daughter removed, and threatening to burn her house down. She read Respondent a text message allegedly sent to her by the defendant after the issuance of the TRO.

During cross-examination, defense counsel at one point asked the plaintiff if she had ever worked as an exotic dancer, which she admitted. Counsel then asked if she had received "many unwanted advances from men that were overly sexual during [her] time as a dancer." Soon after, Respondent took over the questioning and asked the plaintiff at length about her efforts to stop the alleged assault:

> RESPONDENT: Do you know how to stop somebody from having intercourse with you?
>
> PLAINTIFF: Yes.

6

RESPONDENT:  How would you do that?

PLAINTIFF:  I'd probably physically harm them somehow.

RESPONDENT:  Short of physically harming them?

PLAINTIFF:  Tell them no.

RESPONDENT:  Tell them no.  What else?

PLAINTIFF:  To stop.

RESPONDENT:  To stop.  What else?

PLAINTIFF:  And to run away or try to get away.

RESPONDENT:  Run away, get away.  Anything else?

PLAINTIFF:  I -- that's all I know.

RESPONDENT:  Block your body parts?

PLAINTIFF:  Yeah.

RESPONDENT:  Close your legs?  Call the police?  Did you do any of those things?

PLAINTIFF:  I didn't call the police 'til later when --

RESPONDENT:  I understand that.  I mean, right then and there to stop, did you do any --

PLAINTIFF:  I told him to stop.

RESPONDENT:  -- did you do those things?

PLAINTIFF:  I told him to stop and --

7

RESPONDENT:  Did you try to leave?

PLAINTIFF:  -- I was trying to block him.

RESPONDENT:  Block him, meaning?

PLAINTIFF:  Like I was trying to like, you know, like push him off me.

RESPONDENT:  Okay.  Did you try to leave?

PLAINTIFF:  Yeah.

RESPONDENT:  Did he stop you from leaving?

PLAINTIFF:  Yeah.

RESPONDENT:  And how did he do that?

PLAINTIFF:  He was like holding me like -- there was like a chair and he was like holding me like, you know, like he was like forceful, like I really couldn't do anything.

RESPONDENT: You answered my questions.  I'm going to let [defense counsel] continue.

No witness, alleged victim, or litigant should be treated that way in a court of law.  As the ACJC found, the questions were "wholly unwarranted, discourteous and inappropriate," and were irrelevant to decide whether the court should issue an FRO under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.  The panel similarly observed that "Respondent's questions displayed impatience, discourtesy, and a lack of

8

understanding of applicable law." The questions also shamed the alleged victim by intolerably suggesting that she was to blame.

When asked to explain his conduct before the panel, Respondent said he "was not trying to humiliate her"; he instead claimed he was trying to help a "demoralized" witness on cross-examination and "get her re-engaged in the hearing." He added, "I was really struggling to find out is this a case where there really is something going on and a witness who's just not capable of expressing it or is there something else going on."

Respondent's explanation does not square with the record. The plaintiff plainly testified that defendant forced her to have sexual intercourse against her will. She also described other acts of alleged domestic violence. And she did so without needing any assistance from the trial judge to express herself. The audio recording of her testimony further undermines Respondent's explanation. It reveals that the plaintiff responded directly to questions on both direct- and cross-examination without struggling to do so.

Beyond that, Respondent's coarse questions about how the plaintiff responded during the alleged assault were not relevant. Her testimony, if believed, established an act of sexual assault at the time. See N.J.S.A. 2C:14-2(c)(1) (2016) ("An actor is guilty of sexual assault if he commits an act of sexual penetration with another person" when, among other circumstances,

9

"[t]he actor uses physical force or coercion, but the victim does not sustain severe personal injury.").[2]  That offense turns on the alleged aggressor's use of physical force, not the victim's state of mind or resistance.  State in Interest of M.T.S., 129 N.J. 422, 444 (1992).[3]  If established, sexual assault serves as a predicate act of domestic violence under the PDVA and provides a basis for an FRO.  See N.J.S.A. 2C:25-19(a)(7), -28, -29.

Respondent ultimately dismissed the TRO and declined to enter an FRO. He credited the defendant's testimony and found that the plaintiff was not credible.  Among other reasons, he referred back to his questions during cross-examination:

> When I asked her if she tried to do anything to stop the sexual assault, she didn't have an answer.  I asked if she tried to leave.  I didn't get a good answer in response to that question.  I asked her if she tried to close her legs. And for the record, I believe her testimony was they had intercourse.  And I asked if she tried to use her hands to stop the defendant from sexually assaulting her. Again[,] I did not get an answer that I could understand.

---

[2]  The Legislature has since revised the statute.  L. 2019, c. 474, § 1 (eff. Jan. 21, 2020).  It now provides that "[a]n actor is guilty of sexual assault if the actor commits an act of sexual penetration . . . using coercion or without the victim's affirmative and freely-given permission, but the victim does not sustain severe personal injury."  N.J.S.A. 2C:14-2(c)(1).

[3]  Respondent testified before the ACJC -- more than two years after the FRO hearing -- that he was "still . . . somewhat torn as to how far do you go" when questioning a witness about the details of an alleged sexual assault.

10

Respondent's comments after the hearing ended are just as problematic. When the parties left the courtroom, Respondent spoke about the case with his court staff and law clerk. The back-up CourtSmart recording system captured the following exchange:

> RESPONDENT: What do you think of that? Did you hear the sex stuff?
>
> . . . .
>
> UNIDENTIFIED SPEAKER (U/I): Please don't make me re-live.
>
> RESPONDENT: You think it's all fun and games out here.
>
> U/I: Please don't make me re-live everything I heard.

Respondent later confirmed that "we [are] off the record" and continued:

> RESPONDENT: Well, then, as an exotic dancer, one would think you would know how to fend off unwanted sexual --
>
> U/I: I do remember that, I do.
>
> RESPONDENT: I'm like all right, all right, stop.

Respondent returned to the subject after he and staff discussed other matters, including a staff member's neat handwriting:

> RESPONDENT: What I lack in handwriting skills, I am the master of on the record being able to talk about sex acts with a straight face.

11

U/I: Without laughing?

RESPONDENT: Yup.

Judges set the tone for a courtroom. Especially when it comes to sensitive matters like domestic violence and sexual assault, that tone must be dignified, solemn, and respectful, not demeaning or sophomoric. Respondent failed in that regard. We do not suggest that levity has no place in a courtroom. At appropriate times, and in a tasteful way, judges sometimes inject humor to lighten a proceeding. Respondent's comments, though, were neither appropriate nor tasteful.

In his testimony before the ACJC, Respondent was asked why he made some of the above comments. He said his remarks about "fun and games" were part of an effort to give guidance to his law clerk about the complexity of domestic violence cases. He offered a similar explanation to the panel, adding that he had encouraged his law clerk to watch the trial; he claimed the comments in question followed up on their earlier conversation, "referring to what [he] had said about the uglier parts of what we do as judges, especially in these types of cases."

Like the ACJC and the panel, we do not accept that explanation. The exchange that Respondent initiated was not an instructive lesson of any sort.

12

If anything, Respondent's account of events, offered long after he had time to reflect on his behavior and which he stands by today, undermines his credibility.

Count I alleges that Respondent violated the following sections of the Code:  Canon 1, Rule 1.1; Canon 2, Rule 2.1; and Canon 3, Rule 3.5.  For ease of reference, the text for each of the Rules cited throughout this opinion appears in the footnote below.[4]  The evidence demonstrates beyond a reasonable doubt that Respondent violated all three cardinal principles.

---

[4]  Canon 1, Rule 1.1:  "A judge shall participate in establishing, maintaining and enforcing, and shall personally observe, high standards of conduct so that the integrity, impartiality and independence of the judiciary is preserved."

Canon 2, Rule 2.1:  "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

Canon 2, Rule 2.3:  "A judge shall not lend the prestige of judicial office to advance the personal . . . interests of the judge . . . ."

Canon 3, Rule 3.5:  "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity . . . ."

Canon 3, Rule 3.8:  "[A] judge shall not initiate or consider [unauthorized] ex parte . . . communications concerning a pending . . . proceeding.")

Canon 3, Rule 3.17(B):  "Judges shall disqualify themselves in proceedings in which their impartiality or the appearance of their impartiality might reasonably be questioned . . . ."

B.

Count II relates to a personal guardianship matter involving Respondent, his ex-wife, and their son. It asserts that Respondent asked the Family Division Manager in the Ocean Vicinage (the Manager) to contact her counterpart in another vicinage and request that the hearing in the upcoming guardianship trial be rescheduled to accommodate Respondent.

Respondent and the Manager provided different accounts in their testimony, particularly about a critical conversation between them on March 10, 2017. Respondent denies the core allegation. He insists he never asked the Manager to intercede for personal reasons or try to arrange for the hearing to be conducted on consecutive trial days.

The Manager testified that Respondent called her on her personal cell phone on March 10, 2017, three days before the then-scheduled trial date. The Manager recounted that Respondent asked her to call her counterpart to try to get the schedule changed and arrange for consecutive hearing days in the

---

R. 1:12-1(g): "The judge of any court shall be disqualified . . . when there is any . . . reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so."

We quote from the revised Code of Judicial Conduct, which took effect on September 1, 2016. Respondent's conduct in Counts I, III, and IV predates the revisions to the Code. The changes did not substantively alter Canons 1, 2, and 3, which apply here, and Respondent has not contested the applicability of the revised Code to this matter.

14

upcoming trial. The Manager understood the request was to accommodate Respondent's personal schedule but that she was to refer only to his court calendar. According to the Manager, Respondent added words to this effect: "This conversation never happened." The Manager did not make the call.

The Manager's testimony was corroborated by contemporaneous handwritten notes she made during the conversation. The notes contained details about a guardianship matter pending in another vicinage and included a reference to "consecutive hearing days." Cell phone records also reveal that Respondent called the Manager's cell phone on March 10 and left a voicemail. Minutes later, the two had a conversation that lasted ten minutes. While preparing for her testimony, the Manager found several additional documents that were introduced for the first time before the panel: a page of handwritten notes and two emails, which corroborated the timeline she had relayed to the ACJC and the panel.

Respondent at first told ACJC investigators that he spoke with the Manager about the guardianship matter on one occasion. After checking his cell phone records, he acknowledged in his testimony before the ACJC that he called the Manager three times in March -- March 10, 13, and 16 -- and once in December 2016.

He claimed that on March 10, he called to remind the Manager that he had to leave work at a particular time that day -- not to seek a scheduling change for the trial. (That call lasted ten minutes.) Respondent testified that he called the Manager on March 16 to relay that the guardianship trial had been adjourned until March 23. At the time, he knew the case "was going to settle." He testified that it was not until the March 16 call that he raised the idea of the Manager speaking with her counterpart because he was concerned about the number of litigants scheduled to appear on his court calendar on March 23. Respondent recalled that the Manager told him he should "take care of [his] family." (According to phone records, the March 16 call lasted three minutes.)

Respondent also claimed that the Manager's handwritten notes -- with the notation "consecutive hearing days" -- related to an earlier conversation in December, not the March 10 call. Before the panel, he testified the prior conversation related to security concerns.

In addition to the documentary evidence and phone records, the circumstances of the guardianship matter support the Manager's testimony. Settlement discussions shortly after March 10 would have mooted any need to ask for consecutive hearing days later in time.

16

The ACJC found the

> collective circumstances lend significant weight to [the Manager's] testimony concerning the contemporaneous nature of her handwritten notes and the substance of her telephone conversation with Respondent on March 10, 2017. Given the length of that discussion, the proximity of Respondent's guardianship trial to that discussion, the lack of any reference to settlement discussions prior to March 13, 2017 that would indicate a trial was unnecessary, and [the Manager's] consistent testimony about these matters, we find her recounting of these events more persuasive than Respondent's.

After reviewing the record at length, the panel likewise concluded, "[h]aving had the opportunity to hear and observe two witnesses [who] provided vastly divergent testimony, the panel concludes beyond a reasonable doubt that [the Manager's] testimony is more credible and worthy of belief."

We agree with the ACJC's and the panel's findings. Respondent should not have asked the Family Division Manager in the Ocean Vicinage to try to reschedule a court hearing date in a personal matter. Like any other litigant, Respondent should have worked through his attorney, not a high-level court employee who worked in the same courthouse where he served as a judge.

Count II alleges that Respondent violated Canon 1, Rule 1.1, and Canon 2, Rules 2.1 and 2.3(A) of the Code. The evidence demonstrates beyond a reasonable doubt that Respondent violated those precepts.

17

## C.

Respondent stipulated that his conduct in Count III violated the Code. The matter relates to a hearing Respondent presided over in Carbonetto v. Carbonetto. In that case, another judge had ordered the defendant's arrest if he failed to pay $10,000 in spousal support, out of an arrearage of $144,914.40, by November 13, 2015. The defendant made no payments. He was arrested on March 9, 2016 and brought before Respondent.

At the outset of the hearing, Respondent acknowledged the defendant by his first name and noted "for the record [that] I've known Al Carbonetto and his wife since high school. Tina Bizzucci at that point." Respondent stated he did not "believe [he] ha[d] a conflict" but "reserve[d] the right to recuse [himself] because of the nature of [his] relationship" with defendant's "ex-wife." Respondent proceeded to take testimony from the defendant and then vacated the warrant. As the panel observed,

> [a]ny reasonable, fully informed person would have had doubts about Respondent's impartiality when, after announcing in open court that he knew both parties, Respondent reduced the defendant's purge amount from $10,000 to $300 based solely on uncorroborated financial information supplied by the defendant, without contacting probation or the plaintiff and without any apparent review of and reflection upon the history of the litigation.

18

Count III asserts Respondent violated Canon 1, Rule 1.1, and Canon 2, Rule 2.1, and Canon 3, Rule 3.17(B) of the Code, as well as New Jersey Court Rule 1:12-1(g). The uncontested evidence demonstrates beyond a reasonable doubt that he did.

D.

Respondent also stipulated that his behavior outlined in Count IV violated the Code. The count concerns a complaint in the matter of T.B. v. C.P. to establish the paternity of a child who resided outside New Jersey. The violation relates to an ex parte conversation Respondent had with the defendant/mother in the case.

The defendant failed to appear in court on May 26, 2016, and Respondent entered an order that day to facilitate paternity testing for defendant and her child. The order also relisted the matter for a hearing on July 6, 2016. On that day, the putative father -- but not the defendant -- appeared before Respondent. At Respondent's direction, court staff attempted to call defendant and left a message asking her to call back. Respondent then adjourned the matter, and plaintiff left the courtroom.

Minutes later, defendant called Respondent's chambers, and the call was routed to the courtroom. In front of a crowded courtroom, Respondent engaged in a nine-minute exchange with defendant. He asked for her address,

which she did not want to disclose. Defendant told Respondent that she "ran off" because she "was very scared." When Respondent pressed for her address to send her a copy of the order, she asked to have it "sent to a lawyer" because she was "just scared to disclose [her] address." Defendant added that she acted "for the safety of [her] children"; she asserted that plaintiff had molested her daughter and that she also feared for her son's safety.

During the back-and-forth, Respondent threatened to "assess financial penalties against [defendant] that will make it very difficult . . . to ever get out from underneath this if [she did] not cooperate"; told defendant "he's going to find you, ma'am. We're all going to find you."; told defendant that if she did not cooperate, she would "have no credibility with the [c]ourt in the future if" she made "the allegation [she was] making today"; and advised her she "really need[ed] to just comply and fight it out"; among other things.

As the panel correctly observed, Respondent's disturbing comments and questions were insensitive, threatening, and discourteous, and they reflected poorly on his temperament.

Count IV alleges Respondent violated Canon 3, Rule 3.8 of the Code. Once again, the undisputed evidence demonstrates beyond a reasonable doubt that he did.

## III.

The system of judicial discipline is not designed to punish judges.  In re Yaccarino, 101 N.J. 342, 386-87 (1985).  Its overriding purpose is to preserve "public confidence in the integrity and the independence of the judiciary."  In re Seaman, 133 N.J. 67, 96 (1993).

The same principles apply to the judicial removal statutes, N.J.S.A. 2B:2A-1 to -11.  Under the law, this Court may remove a judge from office "for misconduct in office, willful neglect of duty, or other conduct evidencing unfitness for judicial office, or for incompetence."  N.J.S.A. 2B:2A-2.  Yet removal, like other forms of discipline, "'is not punishment for a crime,' but rather serves to vindicate the integrity of the judiciary."  Yaccarino, 101 N.J. at 387 (quoting In re Coruzzi, 95 N.J. 557, 577 (1984)).

"Public confidence in the judiciary 'is shaken when a judge commits an offense [or conduct] that subjects him or her to removal,'" and "removal proceedings are designed to restore faith."  In re Samay, 166 N.J. 25, 42 (2001) (alteration in original) (quoting Coruzzi, 95 N.J. at 572).  Above everything else, removal hearings are meant to "assure the public that the judiciary is worthy of its trust."  Coruzzi, 95 N.J. at 577.  The "predominant" concern is "the public interest."  Yaccarino, 101 N.J. at 396; accord In re Imbriani, 139 N.J. 262, 266 (1995).

21

Certain aggravating and mitigating factors are pertinent to a removal inquiry. Seaman, 133 N.J. at 98-100. To assess the gravity of the misconduct, relevant aggravating factors include "the extent to which the misconduct . . . demonstrates a lack of integrity and probity," a "lack of independence or impartiality," or a "misuse of judicial authority that indicates unfitness"; whether the conduct "is unbecoming and inappropriate for one holding the position of a judge"; and whether it has been repeated or has harmed others. Id. at 98-99 (citations omitted).

Mitigating factors include whether "a matter represents the first complaint against a judge," "the length and . . . quality of the judge's tenure in office," the judge's "personal and professional reputation," "sincere commitment to overcoming the fault," and his or her "remorse and attempts at apology." Id. at 100. Also relevant is the likelihood that "a judge . . . will engage in similar misconduct in the future." Ibid.

IV.

Respondent has been a lawyer since 1997. He served as a law clerk in the Superior Court before he began to work in private practice. He had six years' experience as an Administrative Law Judge before his appointment to the Superior Court in December 2015. The following month, he received formal training for new judges geared toward the Family Division. In January

22

and April 2016, he received training related to the Prevention of Domestic Violence Act.

There is no dispute that Respondent should have known better than to mistreat an alleged victim and foster an atmosphere of disrespect toward her in court, to ask court staff to intercede on his behalf in connection with a personal matter, or to foster the appearance of impropriety by not recusing himself and engaging in an improper ex parte conversation.

Respondent points to several mitigating factors including an otherwise clean disciplinary record; a record of public service; and his admirable devotion to his son. We acknowledge those factors in our analysis. We give no weight, however, to Respondent's observation that the ACJC did not recommend his removal. The appropriate level of discipline in any case of judicial misconduct is for the Court to determine. Respondent also expresses remorse yet at the same time, with respect to Counts I and II, he disputes certain important facts and offers explanations for his conduct that do not ring true.

Viewed together, Respondent's multiple acts of misconduct have lasting consequences. His pattern of misconduct and unethical behavior not only undermined the integrity of different court proceedings but also impaired his

23

integrity and the Judiciary's. His overall behavior reflects a lack of probity and fitness to serve as a judge. And his conduct breached the public's trust.

It is inconceivable that Respondent could sit in judgment in domestic violence or sexual assault matters in the future. No reasonable victim could have confidence in a court system were he to preside over those kinds of cases again. Nor could any objective, informed member of the public. For the same reasons, public confidence in the integrity and independence of the Judiciary would be undermined if Respondent were to preside over other types of cases. Legitimate concerns about integrity, ethics, and public confidence extend to all areas of the Judiciary.

As noted earlier, judicial discipline is not designed to punish judges; it is meant to restore and maintain the dignity of judicial office and to preserve and promote confidence in the Judiciary's integrity and independence. In re Subryan, 187 N.J. 139, 153 (2006); Seaman, 133 N.J. at 96-97. The public's interest is our principal concern. Imbriani, 139 N.J. at 266; Yaccarino, 101 N.J. at 396.

The vast majority of the more than 400 judges who serve on the Superior Court abide by the highest of ethical standards. In carrying out their responsibilities, they must uphold the law. Occasionally, judges are required to make difficult decisions that may be unpopular. They have no reason to

fear that discipline will be imposed in such instances. Judicial independence, which is central to our constitutional democracy, rests on those core values.

Judges may also make mistakes while reasonably carrying out their duties in good faith. That is not a basis for discipline either. See Seaman, 133 N.J. at 97. Potential legal errors are properly challenged and reviewed on appeal instead.

The series of ethical failures that Respondent committed are not errors of law, innocent missteps, or isolated words taken out of context. Viewed as a whole, they are flagrant and serious acts of misconduct. See In re Williams, 169 N.J. 264, 276 (2001). The conduct involved in Count I in particular, the most serious of the violations, reveals a fundamental misunderstanding of the nature and seriousness of domestic violence and sexual assault matters, disrespectful treatment of an alleged victim, and an inability to maintain decorum in a court of law. Respondent's explanations under oath about what occurred also reveal a lack of candor on multiple occasions, which factors into our judgment in this matter.

## V.

For all of the above reasons, based on the entire record, we find beyond a reasonable doubt that there is cause for removal in this case. See N.J.S.A.

25

2B:2A-9. In light of Respondent's serious and repeated acts of misconduct, we are compelled to direct that Respondent be removed from office.


JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON and TIMPONE join in CHIEF JUSTICE RABNER's opinion.

## SUPREME COURT OF NEW JERSEY
### D-100 September Term 2018
### 082636

In the Matter of          :

John F. Russo, Jr.,       :          **O R D E R**

A Judge of the Superior   :

Court                     :

**FILED**

MAY 26 2020

*Heather J Baker*
CLERK

**John F. Russo, Jr.,** a Judge of the Superior Court of New Jersey, having been ordered to show cause why he should not be removed from judicial office, and, the Court having found beyond a reasonable doubt that there is cause for respondent's removal for the reasons set forth in the Court's opinion filed concurrently with this order, and for good cause appearing;

It is ORDERED that **Judge John F. Russo, Jr.,** is removed from judicial office, effective immediately, and is permanently barred from holding judicial office in this State.

WITNESS, the Honorable Stuart Rabner, Chief Justice, at Trenton, this 26th day of May, 2020.

*Heather J Baker*

CLERK OF THE SUPREME COURT